**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 27, 2020

*Stephens, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 27, 2020

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| KIMBERLY J. GERLACH, individually, | |
| Petitioner, | |
| v. | NO. 97325-3 |
| THE COVE APARTMENTS, LLC, a Washington corporation; and WEIDNER PROPERTY MANAGEMENT, LLC, a Washington corporation, | |
| Respondents, | EN BANC |
| and | |
| WEIDNER APARTMENT HOMES, a Washington business entity, d/b/a THE COVE APARTMENTS, and WEIDNER ASSET MANAGEMENT LLC, a Washington corporation, | Filed: August 27, 2020 |
| Defendants. | |

STEPHENS, C.J.—After a night of drinking with friends, Kimberly Gerlach

fell from the second-story balcony of her boyfriend's unit at the Cove Apartments

when the decayed balcony railing gave way. Gerlach sued, arguing Cove's failure to repair the railing caused her fall and violated Cove's duties to tenants and their guests. A jury agreed and found Cove was 93 percent at fault for Gerlach's injuries. The Court of Appeals overturned this verdict and remanded for a new trial, reasoning the trial court erred by excluding evidence of Gerlach's blood alcohol concentration (BAC) and by not dismissing Gerlach's statutory claim under the Residential Landlord-Tenant Act of 1973 (RLTA), ch. 59.18 RCW.

We reverse the Court of Appeals. The trial court did not abuse its discretion by excluding BAC evidence that was only minimally relevant to Cove's affirmative defense and risked prejudicing the jury against Gerlach. While we agree that the trial court should not have allowed Gerlach's RLTA claim, this error alone does not justify a new trial because the jury's verdict remains valid as to Gerlach's common law claim. Accordingly, we reinstate the verdict in favor of Gerlach.

FACTS

One evening in October 2012, Gerlach went to a birthday party with her boyfriend, Nathan Miller, and their friends, Brodie and Colin Liddell.[1] After the party, the four friends went out to a bar. When the bar closed for the night, Gerlach and Brodie made their way back to Miller's unit at the Cove Apartments while Miller

---

[1] Because Brodie and Colin Liddell share a surname, we use their first names for the sake of clarity. We intend no disrespect.

and Colin went to a convenience store. As Gerlach headed up toward Miller's second-story apartment, Brodie stayed outside to smoke.

A short time later, Brodie heard a sharp snap and turned to see Gerlach plummeting headfirst from the balcony of Miller's apartment onto the concrete steps below. The decayed balcony railing fell beside her. Brodie called 911 and checked Gerlach's vital signs. Miller and Colin arrived while paramedics were en route.

The parties dispute how Gerlach fell. Gerlach argued at trial that she was standing on the balcony and leaning on the railing when it gave way, while Cove argues Gerlach likely fell while trying to climb over the railing onto the balcony. But no one actually saw Gerlach fall, and Gerlach herself has no recollection of that evening.

Either way, Gerlach was unconscious and unresponsive when paramedics arrived. King County Medic One rushed her to Harborview Medical Center, where Gerlach was admitted with a traumatic brain injury, skull fractures, and cerebral hemorrhaging that required surgery. Harborview also conducted a blood test less than an hour after Gerlach fell, which showed her BAC was approximately 0.219.

## PROCEDURAL HISTORY

Gerlach sued Cove Apartments for negligently causing her injuries, arguing Cove's failure to repair the decayed railing violated its common law duties to tenants

and their guests, its duties as a landlord under the RLTA, and its duties under its lease agreement with Gerlach's boyfriend. Cove moved for summary judgment on the second and third claims, arguing Gerlach could not prevail because she was not Cove's tenant. The trial court agreed and granted summary judgment for Cove on Gerlach's claim under the lease, but ruled Gerlach could recover under the RLTA despite not being a tenant. Gerlach's RLTA and common law claims went to trial.

At trial, Cove claimed the "complete defense to an action for damages for personal injury" available under RCW 5.40.060 when "the person injured . . . was [(1)] under the influence of intoxicating liquor or any drug at the time of the occurrence causing the injury . . . and [(2)] that such condition was a proximate cause of the injury . . . and [(3)] the trier of fact finds such person to have been more than fifty percent at fault." RCW 5.40.060(1). To support this defense, Cove sought to offer into evidence the results of the blood test taken by Harborview showing Gerlach's BAC was approximately 0.219, as well as expert testimony relating to those results.[2]

Gerlach moved to exclude the blood test results and related testimony under Evidentiary Rule (ER) 403, arguing the probative value of that evidence was

---

[2] Extrapolating from the Harborview blood test, Cove expert witness Dr. Frank Vincenzi would have testified that Gerlach's BAC would have been roughly 0.238 at the time she fell.

substantially outweighed by the danger of unfair prejudice. The trial court was initially inclined to admit that evidence but decided to exclude it after Gerlach admitted the fact of her intoxication.[3] The trial court also excluded the testimony of Dr. Thomas Wickizer, a health economist who would have challenged Gerlach's claimed medical expenses, because his testimony would not have helped the jury to determine whether those expenses were reasonable.

The jury found both Cove and Gerlach negligently contributed to Gerlach's injuries, with Cove bearing 93 percent of the fault and Gerlach bearing 7 percent. Without objection from either party, the jury used a verdict form that did not distinguish between negligence premised on Cove's common law duties and negligence premised on Cove's duties under the RLTA. Cove appealed, assigning error to the trial court's denial of summary judgment on Gerlach's RLTA claims, its exclusion of the BAC evidence and related testimony, nearly a dozen jury instructions or proposed instructions, and other issues.

The Court of Appeals reversed and remanded for a new trial. Relevant to our review, the Court of Appeals held the trial court abused its discretion by excluding the BAC evidence and related expert testimony and this error was prejudicial to

---

[3] The trial court described Gerlach's admission as a stipulation between the parties. Cove insists it never agreed to such a stipulation. The distinction between an admission and a stipulation is not relevant here, where the jury was unambiguously told Gerlach had been intoxicated when she fell.

Cove's ability to present its defense. *Gerlach v. Cove Apts., LLC*, 8 Wn. App. 2d 813, 817, 446 P.3d 624 (2019). The Court of Appeals also concluded the trial court erred by denying Cove's motion for summary judgment on Gerlach's RLTA claims and by instructing the jury that Cove owed Gerlach a duty under the RLTA, because "Washington has adopted § 17.6 [of the *Restatement (Second) of Property: Landlord and Tenant* (Am. Law Inst. 1977)] only in cases where a landlord's negligence is alleged by a tenant." *Id.* at 832-33. Without further analysis, the Court of Appeals declined to extend Washington's adoption of § 17.6 to tenants' guests.

Gerlach petitioned this court for review, which we granted.[4] *Gerlach v. Cove Apts., LLC*, 193 Wn.2d 1037 (2019).

## ANALYSIS

This case centers on two decisions made by the trial court: one about whether to admit evidence and one about the meaning of the RLTA. We review the evidentiary decision for abuse of discretion, deferring to the trial court's judgment unless we are "convinced that '*no reasonable person* would take the view adopted by the trial court.'" *Gilmore v. Jefferson County Pub. Transp. Benefit Area*, 190 Wn.2d 483, 495, 415 P.3d 212 (2018) (internal quotation marks omitted) (reinstating

---

[4] We also granted review of issues Cove conditionally raised in its answer to the petition for review—namely, the exclusion of Dr. Wickizer's testimony regarding the reasonableness of Gerlach's medical expenses and the scope of the trial on remand.

verdict overturned by Court of Appeals because trial court had excluded expert testimony (quoting *State v. Salgado-Mendoza*, 189 Wn.2d 420, 427, 403 P.3d 45 (2017))). In contrast, we give no deference to the trial court's interpretation of the RLTA. *See Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002) ("The meaning of a statute is a question of law reviewed de novo." (citing *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001), *overruled in part on other grounds by State v. Barber*, 170 Wn.2d 854, 248 P.3d 494 (2011))).

I. The Trial Court Did Not Abuse Its Discretion by Excluding the Results of Gerlach's Hospital Blood Draw and Related Expert Testimony

Cove argues the trial court abused its discretion by excluding from evidence the BAC results of Gerlach's blood work at Harborview and related expert testimony, which Cove claims would have shown Gerlach's intoxication made her more than 50 percent at fault for her injuries. The Court of Appeals agreed. Gerlach counters that the trial court acted within its discretion under ER 403 because that evidence would have been far more unfairly prejudicial to Gerlach than probative of Cove's affirmative defense. Because the trial court's decision was within the bounds of its considerable discretion, we agree with Gerlach and reverse the Court of Appeals.

A. The Trial Court Appropriately Exercised Its Discretion under ER 403 To Exclude Minimally Probative and Speculative Evidence That Posed a Significant Risk of Unfair Prejudice

Cove argues the trial court erred by excluding evidence central to its affirmative defense. But "[t]rial courts enjoy 'wide discretion in balancing the probative value of evidence against its potentially prejudicial impact.'" *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 671, 230 P.3d 583 (2010) (quoting *State v. Stenson*, 132 Wn.2d 668, 702, 940 P.2d 1239 (1997)). Even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403.

"When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists." *Salas*, 168 Wn.2d at 671 (citing *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995)). Though rare, the danger of unfair prejudice can exist even when the evidence at issue "is undeniably probative of a central issue in the case." *Carson v. Fine*, 123 Wn.2d 206, 224, 867 P.2d 610 (1994) (citing *United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1041 (11th Cir. 1988)). Here, the trial court appropriately determined Cove's proffered evidence was only minimally probative of the issues relevant to its affirmative defense and found the relative risk of prejudice against Gerlach was unacceptably high.

To prevail on its affirmative defense, Cove was required to prove that (1) Gerlach was intoxicated when she fell, (2) her intoxication was a proximate cause of her injury, and (3) she was more than 50 percent at fault. RCW 5.40.060(1). At trial, Gerlach admitted to the fact of her intoxication.[5] Cove therefore needed to prove only causation and degree of fault to avoid liability for Gerlach's injuries.

Cove sought to admit the BAC results of Gerlach's blood work at Harborview as foundation for the expert testimony of Dr. Frank Vincenzi and Dr. Michael Carhart.[6] Dr. Vincenzi would have testified that "essentially everybody will be impaired" at the blood alcohol level Harborview's test found in Gerlach. 2 Verbatim Report of Proceedings (VRP) (June 14, 2017) at 1533. In an offer of proof, Dr.

---

[5] If a plaintiff does not admit to being intoxicated, RCW 5.40.060(1) uses the same standard as required for criminal convictions under RCW 46.61.502. That statute provides two methods by which parties can prove a person was under the influence of drugs or alcohol. First, a party may prove that a person was under the influence per se by showing their BAC was 0.08 or higher through a timely blood or breath test that complies with state toxicology standards. RCW 46.61.502(1)(a). Second, a party may show a person is "under the influence of or affected by intoxicating liquor" by other evidence. RCW 46.61.502(1)(c). By providing two different methods to prove intoxication, "the legislature was drawing a distinction between tests performed by the State and its agents . . . and other tests, such as tests done . . . for medical treatment." *City of Seattle v. Clark-Munoz*, 152 Wn.2d 39, 49, 93 P.3d 141 (2004). So tests done for medical purposes are admissible to prove intoxication under RCW 46.61.502(1)(c), but they are "subject to the usual evidentiary checks" as any other proffered evidence, including ER 403. *Id.*

[6] The Court of Appeals held the trial court did not err by excluding Dr. Carhart's testimony because "Dr. Carhart is not an expert in how alcohol affects the human body, and his testimony on this issue would have been speculative." *Gerlach*, 8 Wn. App. 2d at 827. Cove did not challenge this holding in its answer to the petition for review, so it is not at issue here.

Vincenzi opined that Gerlach's "[p]sychomotor impairment" was "critical in this case" because, given her BAC results, Gerlach was probably "staggering, stumbling, holding on to objects for balance, falling down or lost [her] balance, and of course that's in my opinion what happened here." *Id.* at 1532-33.

But in response to questions from Gerlach's counsel, Dr. Vincenzi confirmed that his testimony would be about "population averages," *Id.* at 1536, and that he could not "specifically say anything about Ms. Gerlach herself," *id.* at 1540. Dr. Vincenzi did not know "what her burn-off ration would be for alcohol," "what her absorption rate would be for alcohol," "what her metabolic rate would be with regard to alcohol," or "when at any particular time that Kim Gerlach allegedly consumed any alcohol on October 26 or October 27, 2012." *Id.* at 1536-37. Pressed on whether he had "actual facts to apply to Ms. Gerlach in this matter," Dr. Vincenzi replied that he "ha[d] her body weight and [had] the average volume on distribution in females and base my calculations on those," but conceded "average volume in females" was "based upon a population average, [and] not Ms. Gerlach." *Id.* at 1539.

Gerlach moved to exclude this testimony, arguing that "an expert cannot testify on how an intoxicant is likely to affect an individual on any particular occasion" because, absent evidence that the intoxicant actually had that effect on the individual, such testimony would be speculative and unfairly prejudicial. Clerk's

Papers (CP) at 974 (citing *State v. Lewis*, 141 Wn. App. 367, 387, 166 P.3d 786 (2007) (holding trial court properly excluded speculative testimony from medical examiner on the general effects of high levels of methamphetamine, including causing aggressive and irrational behavior, because medical examiner could not speak to whether methamphetamine had those effects on the individual in question and there was no other evidence that it had)). The trial court agreed with Gerlach, explaining,

> We don't have a very clear understanding of exactly what—of what occurred in this accident, except that we know that the railing failed, and we know that because it was on the ground along with the plaintiff and we can see the holes and the rot in the guardrail and that seems to be without any question.
> So we don't know what the plaintiff did immediately prior to the railing failing. We know that she—well, we now know that she had had a significant amount of alcohol to drink, enough to make her intoxicated at the time of the event.
> *But whether or not that intoxication has anything at all to do with the actual accident, until we have something further, facts further to support that allegation, it's more prejudicial than probative to allow Dr. Vincenzi to come in and opine how the plaintiff was acting immediately before she fell.*

1 VRP (June 15, 2017) at 1562 (emphasis added). The trial court ruled Dr. Vincenzi would not be allowed to testify for any purpose, including to establish "that even at the .08 level, [t]here are . . . impairments people have when they drink," *id.* at 1563, because such generalized testimony would be merely "speculative," CP at 1553.

The trial court's ruling is sound. The problem with "speculative testimony is that the trier of fact will be forced to speculate as to causation without an adequate

factual basis." *Volk v. DeMeerleer*, 187 Wn.2d 241, 277, 386 P.3d 254 (2016) (citing *Little v. King*, 160 Wn.2d 696, 705, 161 P.3d 345 (2007)). Cove offered the BAC results and Dr. Vincenzi's testimony to prove Gerlach's intoxication was a proximate cause of her injuries and that she was more than 50 percent at fault. But like the medical examiner in *Lewis*, Dr. Vincenzi's proffered testimony was merely speculative as to Gerlach's behavior. He was going to speak to the general effects of intoxication, not the effect it actually had on Gerlach. Dr. Vincenzi acknowledged he could not speak to whether Gerlach experienced or acted on such effects, so his testimony would not have helped the jury determine whether Gerlach's actions caused her injuries or increased her degree of fault. "Such speculative testimony is not rendered less speculative or of more consequence to the jury's determination simply because it comes from an expert." *Lewis*, 141 Wn. App. at 389. Dr. Vincenzi's testimony would have been only minimally probative of causation and fault because he could not link Gerlach's intoxication to any actual behavior leading to her fall. 2 VRP (June 14, 2017) at 1540.

Worse, Dr. Vincenzi's testimony about the general effects of high levels of intoxication risked prejudicing the jury against Gerlach because it was "likely to stimulate an emotional response rather than a rational decision." *Salas*, 168 Wn.2d at 671. In his offer of proof, Dr. Vincenzi indicated his testimony essentially would

have been that Gerlach was so drunk *she must have been* impaired and making risky decisions.  As Gerlach's counsel cautioned the trial court, "a blood alcohol [level] three times the limit [is] going to be really hard for a jury to get out of their brains"— at that point, "the bell's been rung."  1 VRP (June 15, 2017) at 1555-56.[7]  That risk is exacerbated where a medical doctor speculates about the impact such a blood alcohol level may have had on Gerlach without any regard to her actual behavior.  Excluding such speculative, minimally probative evidence and testimony as too unfairly prejudicial to Gerlach was well within the trial court's discretion under ER 403.[8]

> B.  The Court of Appeals Erred by Suggesting Higher Blood Alcohol Level Alone Is Relevant to an Intoxicated Plaintiff's Fault and Causation

Misreading our decision in *Peralta v. State*, 187 Wn.2d 888, 389 P.3d 596 (2017), the Court of Appeals wrongly suggested that high BAC levels alone could be evidence of a plaintiff's heightened degree of fault or causation.  *Gerlach*, 8 Wn. App. 2d at 824 (holding "the trial court abused its discretion in excluding the

---

[7] The Court of Appeals agreed that "Gerlach's high blood alcohol level could stimulate an emotional response in a jury," but believed it had high enough probative value that the trial court abused its discretion by excluding it.  *Gerlach*, 8 Wn. App. 2d at 821.

[8] Cove also challenges the trial court's exclusion of Dr. Wickizer's expert testimony, which would have compared Gerlach's medical expenses to Medicare reimbursement rates. The Court of Appeals upheld that exclusion because "[e]vidence that, on average, a procedure costs less than the amount charged or that Gerlach's physicians accept a lesser payment for services from Medicare is not helpful to the jury in determining whether her medical expenses were reasonable."  *Id.* at 829.  We agree and find no error.

evidence of Gerlach's blood alcohol level at the time of the accident and the exclusion prejudiced Cove's ability to prove its affirmative defense"). The Court of Appeals here determined *Peralta* did not support the trial court's decision to exclude evidence in this case because our *Peralta* opinion noted that the State "offered substantial evidence supporting its intoxication defense" even after the plaintiff admitted she was intoxicated, *Peralta*, 187 Wn.2d at 900 n.6, while "the exclusion of Gerlach's blood alcohol evidence resulted in a complete absence of evidence as to the extent of her intoxication," *Gerlach*, 8 Wn. App. 2d at 822. This reasoning is flawed in three ways.

First, the Court of Appeals erred by failing to examine the facts in *Peralta* to understand why the State had been able to offer evidence of the plaintiff's intoxication even after her admission. Unlike Gerlach, the plaintiff in *Peralta* argued she was not bound by her admission that she was intoxicated, so the State was able to offer additional evidence of her intoxication in case the trial court allowed the plaintiff to retract or alter her admission. *See Peralta v. State*, 191 Wn. App. 931, 944, 366 P.3d 45 (2015) ("Peralta argues that the trial court erred when it ruled that her response to the request for admission that she was 'under the influence of intoxicating liquors' constituted an admission that Peralta was under the influence for purposes of RCW 5.40.060(1)."). Our decision in *Peralta* does not support

allowing additional evidence of the plaintiff's intoxication beyond her admission; instead, that decision turned on whether the trial court appropriately instructed the jury that she was bound by that admission.

The Court of Appeals also erred by suggesting Gerlach's BAC results alone could determine her degree of fault. Gerlach admitted the fact of her intoxication—establishing the first prong of Cove's affirmative defense—so the BAC evidence would need to relate to the second and third prongs to be admissible. *See* RCW 5.40.060(1). But the BAC results are not relevant to questions of causation and fault because these questions turn on evidence of a plaintiff's behavior, not intoxication status. While being intoxicated can certainly influence a person's behavior, the fact of intoxication does not prove a person was acting in any particular way. Whether and to what degree a person is at fault depends on how that person acted or failed to act, not their precise degree of intoxication. As noted, the trial court properly concluded that Dr. Vincenzi's testimony about blood alcohol levels was speculative as to Gerlach's behavior. *See* 1 VRP (June 15, 2017) at 1562 ("[W]hether or not [Gerlach's] intoxication has anything at all to do with the actual accident, until we have something further, facts further to support that allegation, it's more prejudicial than probative to allow Dr. Vincenzi to come in and opine how the plaintiff was acting immediately before she fell."). Here, without other evidence or testimony

that could connect Gerlach's BAC results to behavior that caused her fall, the BAC results were not relevant to whether her intoxication was a proximate cause of her injuries or to her degree of fault.

The Court of Appeals further erred by concluding the "lack of [other] evidence of Gerlach's degree of intoxication prejudiced Cove's ability to prove its affirmative defense." *Gerlach*, 8 Wn. App. 2d at 823. The Court of Appeals accurately noted that "[n]one of Gerlach's companions testified as to how many drinks Gerlach consumed that night or that she was extremely intoxicated." *Id.* But Cove, not Gerlach, bears the burden of submitting evidence sufficient to prove its affirmative defense. *See Olpinski v. Clement*, 73 Wn.2d 944, 950, 442 P.2d 260 (1968) ("Defendant has the burden of proof on the issues of his affirmative defense."). The fact that Cove did not have other evidence sufficient to prove its affirmative defense does not show the trial court abused its discretion by excluding the BAC results. All it shows is that Cove lacked sufficient evidence to prove the second and third prongs of its affirmative defense.

For these reasons, the Court of Appeals was wrong to overturn the trial court's discretionary decision to exclude prejudicial evidence of Gerlach's blood alcohol level and related expert testimony. Because this was the ground on which the Court of Appeals overturned the jury's verdict, we reverse and reinstate the verdict in favor

of Gerlach.  We next consider the two bases for the jury's verdict: the RLTA and landlords' common law duties to tenants' guests.

II.  The RLTA Does Not Support a Cause of Action for Personal Injury By the Guest of a Tenant, but the Common Law Does

The legislature enacted the RLTA, ch. 59.18 RCW, to govern the rights, responsibilities, and remedies of residential landlords and tenants.  *Faciszewski v. Brown*, 187 Wn.2d 308, 314, 386 P.3d 711 (2016).  The RLTA requires tenants to pay rent on time, keep their units clean, properly dispose of all waste, restore the premises to their original condition when moving out, and more.  RCW 59.18.130.  The act requires landlords to "keep the premises fit for human habitation" by fulfilling particular duties, including by maintaining "the structural components" of the dwelling unit "in reasonably good repair so as to be usable."  RCW 59.18.060.

Gerlach alleged that by failing to repair the decayed railing, Cove violated its duties as a landlord under the RLTA and negligently caused her injuries.  Cove moved for summary judgment on Gerlach's RLTA claims on the ground that, as a tenant's guest, she is not protected by the act.  The trial court denied Cove's motion and later instructed the jury that a landlord can be liable to a tenant's guest for violating the RLTA.  We review questions of law, including the legal accuracy of jury instructions, de novo.  *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 323, 119 P.3d 825 (2005).

This court has never decided whether or to what extent landlords are liable in tort for violations of their duties under the RLTA. But the Court of Appeals has issued a series of decisions adopting a section of the *Restatement* and holding that "tenant[s have] a remedy, supported by public policy, through which he or she may recover for injuries caused by the landlord's breach of the RLTA." *Lian v. Stalick*, 106 Wn. App. 811, 822, 25 P.3d 467 (2001) (*Lian* I); *see also Lian v. Stalick*, 115 Wn. App. 590, 62 P.3d 933 (2003) (*Lian* II); *Tucker v. Hayford*, 118 Wn. App. 246, 75 P.3d 980 (2003); *Martini v. Post*, 178 Wn. App. 153, 313 P.3d 473 (2013); *Phillips v. Greco*, 7 Wn. App. 2d 1, 433 P.3d 509 (2018).

*Restatement* § 17.6 provides:

> A landlord is subject to liability for physical harm caused to the tenant and others upon the leased property with the consent of the tenant or his subtenant by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of:
> (1) an implied warranty of habitability; or
> (2) a duty created by statute or administrative regulation.

In *Lian* I, Division Three of the Court of Appeals "recognized a cause of action for the implied warranty of habitability under the [RLTA] according to subpart (1) of the *Restatement*." *Tucker*, 118 Wn. App. at 256 (citing *Lian* I, 106 Wn. App. at 822). In *Tucker*, Division Three recognized a cause of action for tenants under the second subsection of the *Restatement*. *Id.* at 257-58 ("We conclude that the Washington Residential Landlord-Tenant Act of 1973 provides a cause of action

-18-

for the injury sustained [by the tenant] here."). Division Two soon followed suit. *See Martini*, 178 Wn. App. at 170-71 (holding § 17.6 "appl[ies] to injuries suffered by a tenant due to a landlord's breach of the implied warranty of habitability or a breach of a duty specified by statute or regulation" (citing *Lian* I, 106 Wn. App. 811)).

Here, Division One ruled that the trial court erred because "Washington has only adopted § 17.6 in cases where a landlord's negligence is alleged by a tenant" and that "section has not been adopted in the context of claims by nontenants." *Gerlach*, 8 Wn. App. 2d at 832-33 (citing *Phillips*, 7 Wn. App. 2d at 6-7). This is an accurate description based on the nature of the claims in the prior cases, but the Court of Appeals did not conduct any further analysis as to whether the *Restatement* section extends a duty to tenants' guests, including Gerlach.

Determining the reach of a landlord's liability under the *Restatement* requires closer examination of the existing precedent. The series of Court of Appeals cases addressing the section inappropriately conflate the common law implied warranty of habitability with a landlord's statutory duties under the RLTA requiring the landlord to "keep the premises fit for human habitation." RCW 59.18.060. *See Tucker*, 118 Wn. App. at 256 (recognizing "a cause of action for the implied warranty of habitability under the Landlord-Tenant Act according to subpart (1) of the

*Restatement*." (citing *Lian* I, 106 Wn. App. at 822)).  Although the RLTA does require landlords to maintain basic standards of habitability, we have never held that that statutory language creates a warranty, much less that it subsumes the common law warranty of habitability.  Rather, our cases have maintained a distinction between the duties imposed by the RLTA and the common law implied warranty of habitability.  *See Foisy v. Wyman*, 83 Wn.2d 22, 28-29, 515 P.2d 160 (1973) (recognizing implied warranty of habitability distinct from the RLTA, which the legislature passed between the filing and resolution of the case); *see also Landis & Landis Constr., LLC v. Nation*, 171 Wn. App. 157, 163, 286 P.3d 979 (2012) ("The implied warranty of habitability recognized in *Foisy* is available to a tenant as a basis for legal action against a landlord under the common law, independent of the Residential Landlord-Tenant Act.").  Because the implied warranty of habitability is independent of the RLTA, the Court of Appeals was wrong to conflate the two in the series of decisions partially adopting § 17.6.

The Court of Appeals here also erred by not sufficiently inquiring as to why Washington law would not support the extension of § 17.6 to nontenants like Gerlach.  A number of Washington cases support the proposition that a landlord owes the same duty to a tenant's guest or employee as the landlord owes to the tenant.  *See, e.g.*, *Regan v. City of Seattle*, 76 Wn.2d 501, 505, 458 P.2d 12 (1969)

(holding landlord is liable "'to his tenant or the tenant's guest'" for a negligent repair (quoting *Rossiter v. Moore*, 59 Wn.2d 722, 725, 370 P.2d 250 (1962))). The Court of Appeals did not adequately address why these cases do not support the full adoption of § 17.6, which states a "landlord is subject to liability for physical harm caused to the tenant *and others upon the leased property with the consent of the tenant*." RESTATEMENT § 17.6 (emphasis added).

We take this opportunity to clarify Washington law by recognizing a cause of action for tenants and their guests for personal injuries caused by a landlord's violation of the common law warranty of habitability, but not under the RLTA.[9]

A. Washington Law Supports Partially Adopting *Restatement* § 17.6 by Recognizing a Cause of Action for Violation of the Implied Warranty of Habitability as to Both Tenants and Their Guests

In its early years, Washington's landlord-tenant law embraced the doctrine of caveat emptor: "let the buyer beware." BLACK'S LAW DICTIONARY 276 (11th ed. 2019). This doctrine provides that a tenant rents property at their own risk, so the landlord cannot be liable for any injuries the tenant suffers for having taken that risk. As we explained in *Teglo v. Porter*:

> It is the general rule, as between landlord and tenant, that, absent agreement to the contrary or a fraudulent concealment of obscure defects, the

---

[9] Gerlach's unchallenged common law claims were based on premises liability, not the implied warranty of habitability. But because Washington courts' treatment of *Restatement* § 17.6 has conflated the common law implied warranty of habitability with the RLTA, we disentangle and explain both here.

> maxim caveat emptor applies, and the tenant takes the demised premises as he finds them. There is no implied warranty or covenant on the landlord's part that the premises are safe or fit for the purpose intended.

65 Wn.2d 772, 773, 399 P.2d 519 (1965) (citing *Hughes v. Chehalis School Dist. No. 302*, 61 Wn.2d 222, 377 P.2d 642 (1963)).

The doctrine of caveat emptor was "formulated at a time when the economy was primarily agrarian." RESTATEMENT § 5.1 cmt. b. It "was based on the premise that the tenant had ample opportunity to inspect the leased property" for defects and that any such defects "were generally reparable by hand by the tenant himself." *Id.* But "the modern residential tenant is severely injured by such a rule." *Id.* The "complexities of construction" in modern homes and apartments mean that most tenants cannot "conduct an inspection of sufficient depth to discover even major defects." *Id.* And even "when hidden defects become known, they are seldom within the ability of the tenant to repair. *Id.*

We recognized this new reality in *Foisy*, 83 Wn.2d at 28. There, a tenant argued his landlord's failure to repair a number of defects—"including a lack of heat, no hot water tank, broken windows, a broken door, water running through the bedroom, an improperly seated and leaking toilet, a leaking sink in the bathroom, broken water pipes in the yard and termites in the basement"—relieved the tenant of his obligation to pay rent. *Id.* at 24-25. We agreed, noting,

> "When American city dwellers, both rich and poor, seek 'shelter' today, they seek a well known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance."

*Id.* at 27 (quoting *Javins v. First Nat'l Realty Corp.*, 138 U.S. App. D.C. 369, 428 F.2d 1071, 1074 (1970)). We reasoned there was "little justification for following a rule that was developed for an agrarian society and has failed to keep pace with modern day realities." *Id.* at 28. We concluded "the old rule of caveat emptor has little relevance to the renting of premises in our society" and held "that in all contracts for the renting of premises, oral or written, there is an implied warranty of habitability."[10] *Id.*

By recognizing an implied warranty of habitability for residential rental property and abandoning caveat emptor in this area, "we discarded the very legal foundation and justification for the landlord's immunity in tort for injuries to the tenant or third persons." *Sargent v. Ross*, 113 N.H. 388, 397, 308 A.2d 528, 533-34 (1973). Absent such immunity, whether a landlord is liable to a tenant's guest for

---

[10] Washington is not alone in abandoning caveat emptor in favor of recognizing an implied warranty of habitability for residential rental property. *See, e.g.*, *Young v. Garwacki*, 380 Mass. 162, 168, 402 N.E.2d 1045, 1049 (1980) ("In the line of cases creating and applying the implied warranty of habitability, we have overthrown the doctrine of caveat emptor." (citing *Berman & Sons, Inc. v. Jefferson*, 379 Mass. 196, 396 N.E.2d 981 (1979))).

injuries caused by the landlord's breach of the implied warranty of habitability is a straightforward question of common law negligence.

We have long held that landlords owe the same common law duties to tenants and their guests. *See, e.g.*, *Regan*, 76 Wn.2d at 505 (holding landlord is liable "'to his tenant or the tenant's guest'" for a negligent repair (quoting *Rossiter*, 59 Wn.2d at 725)); *Flannery v. Nelson*, 59 Wn.2d 120, 123, 366 P.2d 329 (1961) (holding landlord liable to employee of tenant for hidden defect); *Andrews v. McCutcheon*, 17 Wn.2d 340, 345, 135 P.2d 459 (1943) (landlord has duty to maintain premises reserved under its control in a safe condition for use by "tenants and their invitees"); *McCourtie v. Bayton,* 159 Wash. 418, 423-24, 294 P. 238 (1930) (recognizing "the guest, servant, etc., of the tenant is usually held to be so identified with the tenant that his right of recovery for injury as against the landlord is neither more nor less than that of the tenant would be").

Our decision in *Foisy* recognizing landlords' common law duties under the implied warranty of habitability is entirely consistent with this jurisprudential trend. There, we observed that housing conditions that violate the implied warranty of habitability "are a health hazard, not only to the individual tenant, but to the community which is exposed to said individual." 83 Wn.2d at 28. That community includes the tenant's guests, who may be exposed to health hazards presented by a

dangerous condition on the leased premises in violation of the implied warranty of habitability. Consistent with the reasoning in *Foisy*, we adopt *Restatement* § 17.6 to the extent that we recognize a landlord's liability in tort to tenants and their guests for breach of the implied warranty of habitability.

B. The RLTA Does Not Imply a Cause of Action for Tenants' Guests, So We Decline To Adopt the Remainder of *Restatement* § 17.6

In addition to recognizing tort claims for breach of the implied warranty of habitability in subsection (1), *Restatement* § 17.6 subsection (2) outlines a cause of action in tort for injuries tenants or their guests sustain as a result of the landlord's breach of specific statutory (or regulatory) duties. As the *Restatement* observes, "[T]ort liability of the landlord in this situation tends to increase the likelihood that the will of the legislature as expressed in the statute or regulation with be effectuated." RESTATEMENT § 17.6 cmt. a. Allowing tenants to sue their landlords for personal injuries sustained as a result of the landlord's breach of their duties would provide a powerful incentive for landlords to fulfill their statutory duties. *See* RESTATEMENT § 17.6 reporter's note 8 (noting "it will be difficult to insulate the landlord from tort liability when his failure to meet his duty results in injury to the tenant"). And "[i]t would be disconcerting if the tenant who fell through the rotten floor of his kitchen could withhold rent until the hole was repaired, but could not recover for the personal injury he had sustained." *Id.* But the liability theory the

*Restatement* recognizes in this subsection originated in a theory of negligence per se that Washington has largely abandoned. *Compare* RESTATEMENT § 17.6 cmt. a (suggesting violation of a landlord's statutory duty is sufficient to establish landlord liability in tort because "the violation constitutes negligence per se"), *with* RCW 5.40.050 ("A breach of a duty imposed by statute, ordinance, or administrative rule shall not be considered negligence per se, but may be considered by the trier of fact as evidence of negligence.").

Rather than adopt the second part of the *Restatement* unquestioningly, we apply our usual test to determine the existence and scope of an implied cause of action arising from statute. *See Bennett v. Hardy*, 113 Wn.2d 912, 784 P.2d 1258 (1990). In *Bennett*, we established a three-part test to determine whether a statute supports an implied cause of action:

> [F]irst, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation.

*Id.* at 920-21. Here, the first factor is dispositive as to Gerlach's RLTA claim.

The legislature did not enact RLTA for the benefit of tenants' guests but, rather, to regulate the legal relationships between landlords and tenants. The RLTA mentions tenants' guests or invitees only in the context of a tenant's duties to ensure their family and friends do not damage the unit, violate the law, or otherwise

compromise the terms of their lease. *See, e.g.*, RCW 59.18.130(4) (imposing duty on tenant to not "permit any member of his or her family, invitee, licensee, or any person acting under his or her control" to "intentionally or negligently destroy, deface, damage, impair, or remove any part of the structure or dwelling"), .550(1)(d)(ii) ("The tenant may not allow the guests to use, possess, or share alcohol, illegal drugs, controlled substances, or prescription drugs without a medical prescription, either on or off the premises"), .060(15) (providing no "defense or remedy [is] available to the tenant under this chapter, where the defective condition complained of was caused by the conduct of such tenant, his or her family, invitee, or other person acting under his or her control"). No RLTA provisions speak to a landlord's obligations to a tenant's guest. Gerlach, as a guest of Cove's tenant, is therefore not within the class for whose benefit the legislature enacted the RLTA. Because the first *Bennett* factor is dispositive, we need not address the remaining factors to decide the RLTA does not support an implied cause of action for tenants' guests. Accordingly, the trial court erred by allowing the jury to consider Gerlach's claim under this theory of liability.

III. Though the Trial Court Erred by Allowing Gerlach's RLTA Claim To Proceed, the Jury's Verdict Rests on a Valid Common Law Liability Theory and Cove Failed To Object to the Undifferentiated Verdict Form

As noted above, the jury in this case used a verdict form that did not distinguish between negligence premised on Cove's common law duties and negligence premised on Cove's duties under the RLTA. A party challenging the validity of one theory supporting an undifferentiated verdict is not entitled to a new trial unless it objected to the use of the verdict form at trial and proposed a special verdict form to clarify the jury's findings. *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 539-40, 70 P.3d 126 (2003). Cove failed to do so here and therefore is not entitled to a new trial on this ground.

## CONCLUSION

The trial court did not abuse its discretion by excluding evidence that would have been speculative, prejudicial, and only minimally probative of Cove's affirmative defense. While the trial court did err by allowing the jury to consider Gerlach's claim based on Cove's alleged breaches of the RLTA, that error is not a basis to invalidate the jury's undifferentiated verdict, which also rests on common law negligence. Accordingly, we reverse the Court of Appeals and reinstate the verdict in favor of Gerlach.

Stephens, C.J.

WE CONCUR:

Johnson, J.

Yu, J.

Owens, J.

Montoya-Lewis, J.

González, J.

No. 97325-3

GORDON McCLOUD, J. (concurring in part/dissenting in part)—In this

case, the plaintiff's intoxication and the effects of that intoxication on her mattered

tremendously.  If the jury had found that Kimberly Gerlach's intoxication

proximately caused her injuries and that she was more than 50 percent at fault, then

a duly enacted statute would have barred her from collecting money damages for

her injuries.  RCW 5.40.060(1).  Yet the trial court excluded the most probative

piece of evidence about her intoxication: her extremely high blood alcohol

concentration (BAC).  The trial court also barred an expert witness from testifying

about the effects of such a high BAC.  This constitutes an abuse of discretion; I

would therefore affirm the Court of Appeals' decision to reverse.

Separately, I agree with the majority that Gerlach may not recover under the

Residential Landlord-Tenant Act of 1973 (RLTA), ch. 59.18 RCW, and I join that

portion of the majority's opinion.  I do not, however, join the majority's extended

1

analysis of the implied warranty of habitability; that analysis is pure dicta. I therefore respectfully concur in part and dissent in part.

FACTS

After a night of heavy drinking, Gerlach fell from the second-story balcony of her then-boyfriend's apartment. The railing of the balcony fell with her. Nobody saw exactly what happened, and Gerlach does not remember the fall. At trial, the parties presented the jury with two opposing theories.

Gerlach argued that she entered her boyfriend's apartment, went out onto the balcony, and leaned against the railing—which snapped and sent her plummeting to the ground. 1 Verbatim Report of Proceedings (VRP) (July 10, 2017) at 3569-75. According to this theory, alcohol had nothing to do with the fall, and Gerlach was not at fault.

Cove Apartments, on the other hand, argued that Gerlach never made it inside the apartment. Instead, Gerlach fell while attempting to climb over the second-story balcony's railing and onto the balcony, from the outside. *Id.* at 3620-24. According to Cove, Gerlach made the poor decision to climb because she was extremely drunk, and she was unable to successfully scale the balcony for the same reason. *Id.* at 3638-43. According to this theory, alcohol played a major role in the accident, and Gerlach was at fault.

As mentioned above, intoxication can be a "complete defense to an action for damages for personal injury." RCW 5.40.060(1). To succeed on this defense, Cove had to prove that (1) Gerlach "was under the influence of intoxicating liquor" at the time of the accident, (2) the intoxication "was a proximate cause of the injury," and (3) she was more than 50 percent at fault. *Id.* This statutory defense reflects a legislative determination that "[w]hen the intoxicated party is at fault for a majority of his or her injuries, . . . the intoxicated party is responsible for the entire amount of damages." *Estate of Kelly v. Falin*, 127 Wn.2d 31, 49, 896 P.2d 1245 (1995).

Thus, whether Gerlach was intoxicated and how that intoxication affected her ability to function were major issues for trial. Cove had evidence that Gerlach was not simply intoxicated, but was severely intoxicated. A blood draw performed at the hospital after the accident revealed that Gerlach's BAC at the time of the fall was 0.238, or "essentially three times the legal limit for operation of a motor vehicle." Clerk's Papers (CP) at 511. Dr. Frank F. Vincenzi, an emeritus professor of pharmacology at the University of Washington, estimated that based on this BAC, Gerlach had consumed around 14 drinks on the night of the accident and had approximately "9 drinks['] worth of alcohol present in her body at the time of the incident." *Id.* As a result of this calculation, Dr. Vincenzi opined that

3

"alcohol-induced impairment of both judgment and psychomotor function were proximate causes of the tragic outcome." *Id.*  His conclusion, if accepted by the jury, would have satisfied the first two prongs of Cove's statutory defense: (1) that Gerlach was intoxicated at the time of the accident and (2) that the intoxication "was a proximate cause of the injury." RCW 5.40.060(1).  And it would have allowed the jury to evaluate the third element, whether Gerlach was more than 50 percent at fault. *Id.*

But the trial court barred that evidence from ever reaching the jury, thwarting Cove's ability to prove its statutory defense.  I believe this was error, and I would affirm the Court of Appeals on this point.

Separately, I concur in the majority's interpretation of the RLTA.  But I decline to endorse the majority's dicta regarding the implied warranty of habitability.  Thus, I respectfully concur in part and dissent in part.

## ANALYSIS

I.    The trial court erred by excluding Gerlach's BAC and Dr. Vincenzi's testimony

"The Legislature enjoys the power to define and change tort law in our state." *Morgan v. Johnson*, 137 Wn.2d 887, 896, 976 P.2d 619 (1999) (citing *Geschwind v. Flanagan*, 121 Wn.2d 833, 841, 854 P.2d 1061 (1993)).  "In exercising that prerogative, the Legislature has chosen to curtail the rights of

4

certain intoxicated persons in enacting RCW 5.40.060." *Id.* Cove argued that

Gerlach's right to recover in this case was barred by RCW 5.40.060. "We are

obliged to give the plain language of a statute its full effect, even when its results

may seem unduly harsh." *Geschwind*, 121 Wn.2d at 841 (citing *State v. Pike*, 118

Wn.2d 585, 591, 826 P.2d 152 (1992)).

Courts presume relevant evidence is admissible, and the party seeking its

exclusion bears the burden of establishing unfair prejudice. ER 403; *Erickson v.*

*Robert F. Kerr, MD, Inc.*, 125 Wn.2d 183, 190, 883 P.2d 313 (1994) (citing

*Carson v. Fine*, 123 Wn.2d 206, 225, 867 P.2d 610 (1994)). "Although relevant,

evidence may be excluded if its probative value is substantially outweighed by the

danger of unfair prejudice . . . ." ER 403. "Evidence is not rendered inadmissible

under ER 403 just because it may be prejudicial." *Carson*, 123 Wn.2d at 224.

After all, "nearly all evidence will prejudice one side or the other in a lawsuit." *Id.*

Instead, the courts are concerned with *unfair* prejudice, or "prejudice caused by

evidence of '"scant or cumulative probative force, dragged in by the heels for the

sake of its prejudicial effect."'" *Id.* at 223 (quoting *United States v. Roark*, 753

F.2d 991, 994 (11th Cir. 1985) (quoting *United States v. McRae*, 593 F.2d 700, 707

(5th Cir. 1979))). But "where the evidence is undeniably probative of a central

issue in the case," the likelihood that the danger of unfair prejudice will

substantially outweigh the evidence's probative value is "'quite slim.'" *Id.* at 224

(quoting *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1041 (11th Cir.

1988)). "A trial court would necessarily abuse its discretion if it based its ruling on

an erroneous view of the law." *Wash. State Physicians Ins. Exch. & Ass'n v.*

*Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993) (citing *Cooter & Gell v.*

*Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)).

Of course, evidence of Gerlach's severe intoxication would have prejudiced

her. It might have barred her from recovering, depending on what the jury

determined. But the evidence wasn't *unfairly* prejudicial. It wasn't ""'"dragged in

by the heels for the sake of its prejudicial effect."'"" *Carson*, 123 Wn.2d at 223

(quoting *Roark*, 753 F.2d at 994 (quoting *McRae*, 593 F.2d at 707)). Rather,

evidence of her intoxication went to the heart of Cove's statutory defense. That

evidence was undeniably probative of central issues in this case: whether she was

intoxicated, how intoxicated she was and hence how likely it was that her

intoxication was a proximate cause of her injuries, and whether she was more than

50 percent at fault. Accordingly, the likelihood that ER 403 balancing would favor

exclusion of this exceedingly probative evidence was "'quite slim.'" *Id.* at 224

(quoting *0.161 Acres of Land*, 837 F.2d at 1041).

Nevertheless, the trial court excluded the evidence. A review of the record shows that the trial court based its ruling on an erroneous view of the law. Thus, the trial court "necessarily abuse[d] its discretion." *Wash. State Physicians Ins. Exch. & Ass'n*, 122 Wn.2d at 339 (citing *Cooter & Gell*, 496 U.S. at 405).

> A. The trial court wrongly believed that Gerlach's intoxication was relevant only to the first element of Cove's defense

Despite expert testimony to the contrary, the trial court failed to appreciate that Gerlach's severe intoxication could have proximately caused her injuries. For instance, the court initially rejected Dr. Vincenzi's conclusion that Gerlach's extreme intoxication had anything to do with her alleged decision to climb over the balcony or her inability to do so successfully, reasoning that "whether she was drinking or not drinking, if she climbed on the outside of the apartment and fell, then she's contributorily negligent and I don't know that the presence of alcohol has anything to do with that physical fact." VRP (Apr. 7, 2017) at 56. The court then instructed the parties to separate the issue of Gerlach's intoxication from the issue of her contributory negligence: "There's two issues here. There's a consumption of alcohol on the part of the plaintiff and there's a contributory negligence, and I'd like to separate them, because I think they should be separated . . . ." VRP (May 5, 2017) at 102. Of course, Cove's entire argument, supported by Dr. Vincenzi's expert opinion, was that Gerlach made the negligent

decision to climb and was unable to do so *because* she was intoxicated. Gerlach's

intoxication and alleged negligence were intertwined and inseparable.

After additional argument, the trial court seemed to reverse course, ruling

that Gerlach's BAC reading was admissible. 1 VRP (June 14, 2017) at 1333. The

court correctly reasoned that it was up to the jury to decide whether the amount of

alcohol Gerlach consumed was a proximate cause of her injury. *Id.*

Still determined to keep out the BAC reading, Gerlach offered the trial court

a compromise: she would simply admit to being intoxicated, and the trial court

would exclude the reading. *Id.* at 1355. Gerlach argued that her offer to

compromise would settle the first element of Cove's statutory defense (that she

was intoxicated) and "would eliminate the undue prejudice of the blood alcohol

reading." *Id.* Over Cove's objection, the trial court agreed and excluded the BAC

reading, along with Dr. Vincenzi's testimony. 1 VRP (June 15, 2017) at 1560.[1]

But Gerlach's intoxication was relevant to Cove's entire statutory defense,

not merely the first element of it. In addition to proving that Gerlach was

---

[1] Despite Cove's objection, the trial court told the jury that "[t]he parties stipulate that the plaintiff, Ms. Gerlach, was under the influence of intoxicating liquor at the time of the accident." 1 VRP (June 22, 2017) at 2799-800. After initially agreeing to correct that misstatement, VRP (June 27, 2017) at 2948, the trial court backtracked, saying that it did not want to "overemphasize[ ]" Gerlach's intoxication, 1 VRP (July 7, 2017) at 3362-63. The court further stated that it did not "really think the jury cares" and that in any event, "what [the jury] heard was that she admits that she was under the influence." *Id.* The majority endorses this view. Majority at 5 n.3.

intoxicated, Cove also had to prove that her intoxication was a proximate cause of her injury and that she was more than 50 percent at fault.  RCW 5.40.060(1).  As to these two elements, the degree of intoxication matters.  The jury could have concluded that someone who was intoxicated, but not severely so, would have made different decisions and functioned differently than Gerlach, who, according to Dr. Vincenzi, had approximately "9 drinks['] worth of alcohol present in her body" and a BAC "essentially three times the legal limit for operation of a motor vehicle."  CP at 511.  But the court excluded all evidence on this point, impermissibly hindering Cove's ability to prove the bulk of its statutory defense and stripping the jury of its fact-finding role.

As discussed next, the trial court based its ultimate decision on an erroneous view of our precedent.

### B.  The trial court misapplied precedent from our court

The trial court read *State v. Peralta*, 187 Wn.2d 888, 389 P.3d 596 (2017), as compelling the conclusion that Gerlach's BAC was relevant only on the first element of the intoxication defense.  1 VRP (June 15, 2017) at 1561.  But *Peralta* does not say that.  In *Peralta*, the plaintiff admitted during pretrial discovery that she was intoxicated.  187 Wn.2d at 891.  Later, the plaintiff argued that her

admission did not prove the first element of the intoxication defense. *Id.* at 893.

The trial court held that it did, and we affirmed. *Id.* at 904-05.

Thus, all that *Peralta* stands for is that an admission may satisfy the first

element of the intoxication defense. The majority states that "[o]ur decision in

*Peralta* does not support allowing additional evidence of the plaintiff's

intoxication beyond her admission." Majority at 15. But neither does it support

*barring* additional evidence of the plaintiff's intoxication beyond her admission.

Nor does it suggest that an admission is relevant only as to the first element. The

majority is correct that *Peralta* "turned on whether the trial court appropriately

instructed the jury that she was bound by [her] admission." Majority at 15. That

was all that was at issue in that case, and we did not resolve any other issue that

might shine light on the issues in this case. Simply put, *Peralta* is irrelevant, and

the trial court was wrong to rely on it.

*Geschwind*, on the other hand, is on point. That case illustrates that

evidence of a plaintiff's intoxication is not limited to the first element of the

defense but instead informs the other elements, also. In that case, Geschwind sued

Flanagan for injuries sustained in a car accident. *Geschwind*, 121 Wn.2d at 835.

After a night of drinking, Geschwind and Flanagan decided to drive home. *Id.* at

836. Although Flanagan, the driver, hit two cars while pulling out of his parking

space, Geschwind decided to remain in the truck. *Id.* Flanagan proceeded to drive off the road and into a pole. *Id.* Notably, the plaintiff's BAC was part of the record. *Id.*

Geschwind sued Flanagan. *Id.* at 835. Flanagan, the driver, relied on the statutory intoxication defense to argue that Geschwind, the passenger, was primarily at fault. *Id.* The jury agreed, and Geschwind was denied recovery. *Id.* Geschwind appealed, arguing that a passenger, though negligent, could never be more at fault than the driver who caused the accident. *Id.*

We rejected that argument. *Id.* at 839. We reasoned that a jury could have determined that Geschwind made the decision to ride with a drunk driver because he himself was intoxicated, and that his decision was the main cause of his injuries. *Id.* at 841-42; *see also* former RCW 5.40.060 (1992) (providing "a complete defense" if plaintiff's intoxication "was a proximate cause of the *injury*").[2] "'The rationale for this rule is that intoxication diminishes a passenger's appreciation of danger and renders the passenger more likely to take greater risks than usual.'"

---

[2] This statute has since been amended. SUBSTITUTE S.B. 6047, at 43, 53d Leg., Reg. Sess. (Wash. 1994). Today, in actions against drunk drivers, the plaintiff's intoxication must have been "a proximate cause *of the occurrence* causing the injury or death," not simply the injury itself. RCW 5.40.060(2) (emphasis added). Because this change was limited to actions against drunk drivers, it does not affect the case before us.

*Geschwind*, 121 Wn.2d at 842 (quoting WASH. STATE BAR ASS'N, WASHINGTON

MOTOR VEHICLE ACCIDENT DESKBOOK § 12.2(5) (1988)).

The case before us now is very much like *Geschwind*—or at least it would

have been, if the trial court had allowed Cove to present its defense. In

*Geschwind*, we explained that a jury could find Geschwind more than 50 percent at

fault—even though he didn't cause the accident—because it was conceivable that

Geschwind made the negligent decision to ride with a severely intoxicated driver

because he was too intoxicated to appreciate the risk. Here, a jury could have

found Gerlach more than 50 percent at fault—even if the jury also allocated to

Cove some percentage of fault—because it is conceivable that Gerlach made the

poor decision to climb over the balcony or she was physically unable to do so

because she was severely intoxicated. But Cove's argument was curtailed by the

trial court's decision to bar evidence that would have revealed just how intoxicated

Gerlach was and what effect that intoxication had on her.

The trial court incorrectly reasoned that *Geschwind* does not apply to this

case because in *Geschwind*, it was undisputed that Geschwind got in the car with a

drunk driver, but in this case, whether Gerlach climbed the balcony *was* disputed.

1 VRP (June 12, 2017) at 1005-07. But our opinion in *Geschwind* did not turn on

whether or not the parties contested the facts. And for good reason: the jury, not

the court, serves as factfinder. *See Geschwind*, 121 Wn.2d at 839-40. The degree of Gerlach's intoxication would have helped the factfinder resolve the disputed facts and determine whether Cove proved its intoxication defense. Instead, the trial court excluded evidence that went to the heart of Cove's statutory defense, stripping the jury of its fact-finding function.

All the trial court allowed the jury to learn was that Gerlach was "under the influence of intoxicating liquor." 1 VRP (June 22, 2017) at 2799-800. But it is one thing to have a BAC of 0.08, the threshold for driving under the influence, RCW 46.61.502, and another thing entirely to have a BAC of 0.238. Gerlach's BAC was more than "minimally relevant to Cove's affirmative defense." Majority at 2. It was the key piece of evidence to Cove's legislatively defined affirmative defense. If our abuse-of-discretion standard of review insulates this trial court's exclusion of such probative evidence from serious appellate review, then perhaps it is time for this court to reevaluate that standard.

C. The trial court erred in excluding testimony from Dr. Vincenzi

Under our evidence rules, an expert may testify if he or she is qualified and his or her testimony will help the trier of fact. ER 702; *see also L.M. v. Hamilton*, 193 Wn.2d 113, 134, 436 P.3d 803 (2019). To be helpful, the testimony must be reliable and have an adequate foundation. *L.M.*, 193 Wn.2d at 137. An expert may

base an opinion on "facts or data . . . made known to the expert," even if the expert did not personally "perceive[ ]" those facts or data. ER 703. "[A]n expert is not always required to personally perceive the subject of his or her analysis." *In re Marriage of Katare*, 175 Wn.2d 23, 39, 283 P.3d 546 (2012) (citing ER 703). "That an expert's testimony is not based on a personal evaluation of the subject goes to the testimony's weight, not its admissibility." *Id.*; *see also In re Disability Proceeding Against Keefe*, 159 Wn.2d 822, 831, 154 P.3d 213 (2007) (holding that "an in-person evaluation . . . may have strengthened [the expert's] testimony," but the evidence rules do not "require such firsthand knowledge").

Despite this well-settled legal principle, the majority faults Dr. Vincenzi for not personally evaluating Gerlach. Majority at 10. The majority suggests that Dr. Vincenzi should have subjected Gerlach to a battery of examinations to determine her particular burn-off rate ration for alcohol, her particular absorption rate for alcohol, and her particular metabolic rate for alcohol. *Id.* But we have clearly held that such criticisms go to the weight of the expert's testimony, not its admissibility. *Keefe*, 159 Wn.2d at 831. Neither our precedent nor our evidence rules require Dr. Vincenzi to possess the firsthand knowledge of Gerlach that the majority demands of him.

14

Next, the majority holds that Dr. Vincenzi's testimony was too speculative because he did not know exactly what happened on the night of the accident. Majority at 12-13. But nobody knew exactly what happened; figuring that out was the main issue at trial and what the jury was tasked with resolving. Cove hoped to defend itself by presenting its theory of what happened: Gerlach made a poor decision to attempt to climb over the balcony, she made that decision because she was drunk, and she was unable to successfully climb over the balcony because she was too intoxicated. The majority would have you believe that the only piece of evidence Cove had to support its theory was Gerlach's BAC. *See* majority at 16 (holding that the BAC results were inadmissible because Cove lacked "other evidence or testimony that could connect Gerlach's BAC results to behavior that caused her fall"). But that's not right. Cove had an accident reconstructionist testify that given how Gerlach landed and her injuries, she must have been climbing. 1 VRP (July 6, 2017) at 2998-3000. Cove also had an expert pharmacologist, Dr. Vincenzi, ready and able to explain why Gerlach's severe intoxication might have led her to decide to climb and how her severe intoxication would have impeded her ability to do so. 2 VRP (June 14, 2017) at 1531-36. And Dr. Vincenzi was not merely speculating as to Gerlach's level of intoxication; he was able to use her BAC results to calculate just how intoxicated she was prior to

her fall. CP at 511. The BAC was but one piece, albeit a pivotal piece, to the puzzle that was Cove's entire defense.

Speaking of BAC, a recent case provides the quintessential example of a case, quite unlike this one, in which an expert opinion as to intoxication *is* too speculative. In that case, the plaintiff, Needham, sued his medical provider for negligence. *Needham v. Dreyer*, 11 Wn. App. 2d 479, 486, 454 P.3d 136 (2019), *review denied*, 195 Wn.2d 1017 (2020). Over Needham's objection, the trial court allowed defense experts to testify that the plaintiff's alcohol use may have caused his injury. *Id.* Like Gerlach, Needham had argued that the testimony should be excluded as speculative. *Id.*

The Court of Appeals agreed with Needham and reversed. *Id.* at 493. The court reasoned that the expert testimony was speculative because nobody knew how intoxicated Needham had been. *Id.* at 496. Although Needham had admitted to drinking on the day he collapsed, *id.* at 495, "there was no evidence in the record as to either Needham's BAC level or whether Needham drank a sufficient amount of alcohol that night to cause his collapse." *Id.* at 496. "Furthermore, Needham had no alcohol in his system when admitted into the hospital." *Id.* "[W]ith no record or evidence of his blood alcohol level at the time of the collapse," the experts were merely speculating "as to the amount of alcohol consumed prior to

the collapse" and "as to the potential effect of alcohol on Needham's collapse." *Id.*

The Court of Appeals held that such speculative testimony should have been excluded. *Id.*

But the exact opposite is true here. Unlike Needham, Gerlach had a lot of alcohol in her system when she was admitted to the hospital. Dr. Vincenzi, a professor emeritus of pharmacology at the University of Washington, used the blood draw from the hospital to calculate how drunk she was when she fell. *See* ER 702 (allowing an expert to base an opinion on facts made known to the expert). Without a BAC level, I might agree that Dr. Vincenzi lacked an adequate foundation on which to form an opinion and was merely speculating. But with a BAC level, Dr. Vincenzi's testimony had an adequate foundation and would have been incredibly helpful to the jury as it decided whether Cove proved its statutory defense.

D. The trial court's errors were prejudicial

A trial court's error is reversible only if it is prejudicial. *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983) (citing *Thomas v. French*, 99 Wn.2d 95, 104, 659 P.2d 1097 (1983)). "Error will not be considered prejudicial unless it affects, or presumptively affects, the outcome of the trial." *Id.* (citing *James S. Black & Co. v. P&R Co.*, 12 Wn. App. 533, 537,

530 P.2d 722 (1975)).  I agree with the Court of Appeals' conclusion that the trial court's errors in this case were prejudicial.  *Gerlach v. Cove Apts., LLC*, 8 Wn. App. 2d 813, 823, 446 P.3d 624, *review granted*, 193 Wn.2d 1037 (2019).

Without the BAC reading or Dr. Vincenzi's testimony, Cove's hands were tied and the degree of Gerlach's intoxication was repeatedly deemphasized.  Even the trial court deemphasized her intoxication.  1 VRP (July 7, 2017) at 3362-63 (stating that it did not want to "overemphasize[ ]" Gerlach's intoxication).  Nathan Miller, Gerlach's then-boyfriend, testified that he "wasn't really paying attention" to whether Gerlach was drinking and stated that "it would be a guess that she was drinking."  1 VRP (June 21, 2017) at 2362.  The other friends present that night testified that they didn't recall how much Gerlach had to drink.  1 VRP (June 22, 2017) at 2629-31, 2752.  And although Gerlach had admitted in a deposition that she had been drunk when she fell, the trial court excluded her admission, reasoning that "to be an admission, you have to remember what it is you're admitting."  *Id.* at 2718.  As the Court of Appeals concluded, the trial court's rulings "resulted in a complete absence of evidence as to the extent of her intoxication" and "prejudiced Cove's ability to prove its affirmative defense."  *Gerlach*, 8 Wn. App. 2d at 822-23.  I would affirm.

II.     The majority's extended discussion of the implied warranty of
        habitability is unnecessary dicta

As the majority notes, "the jury in this case used a verdict form that did not

distinguish between negligence premised on Cove's common law duties and

negligence premised on Cove's duties under the RLTA."  Majority at 28.  The

majority also notes that Cove's "common law claims were based on premises

liability, not the implied warranty of habitability."  Majority at 21 n.9.

Nevertheless, the majority engages in an extensive analysis of the implied warranty

of habitability.  I decline to join that part of the majority's opinion.  *See In re Det.*

*of Reyes*, 184 Wn.2d 340, 350, 358 P.3d 394 (2015) (Stephens, J., concurring)

(criticizing the majority for an "entire discussion" that amounted to "unnecessary

dicta").

Because the majority spends so much time on it, however, I feel compelled

to note that in expanding the scope of the implied warranty of habitability, the

majority heavily relies on *Foisy v. Wyman*, 83 Wn.2d 22, 515 P.2d 160 (1973).

That case, which was neither a personal injury case nor a case involving a

nontenant, is easily distinguishable.  *Id.* at 23.  There, we held "that in all contracts

for the renting of premises, oral or written, there is an implied warranty of

habitability and breach of this warranty constitutes *a defense in an unlawful*

*detainer action*."  *Id.* at 28 (emphasis added) (citing numerous out-of-jurisdiction

19

cases). We remanded the case for the factfinder to determine "[w]hether the evidence indicates that the premises were totally or partially uninhabitable during the period of habitation." *Id.* at 34. If the factfinder determined that the premises was uninhabitable, then the plaintiff could not succeed on his claim of unpaid rent. *Id.*

Thus, under *Foisy*, a tenant can succeed in an unlawful detainer action by proving that the premises are uninhabitable. But *Foisy* says nothing about whether a nontenant (or even a tenant) can rely on the implied warranty of habitability to succeed in a personal injury action. Perhaps we should build on *Foisy* and craft the new common law rule that the majority advocates for today. But *Foisy* does not compel that result, and I would wait for the case that squarely presents the issue before ruling.

Additionally, the majority fails to grapple with what it means for a dwelling to be "uninhabitable." This is an open question in our court. *See Pinckney v. Smith*, 484 F. Supp. 2d 1177, 1182 (W.D. Wash. 2007) ("Washington appellate courts have reached opposing conclusions as to what conditions are sufficiently dangerous to qualify a residence as uninhabitable and the Washington Supreme Court has not decided the issue."). In *Foisy*, the case in which we first recognized the implied warranty of habitability, the dwelling "contained a number of defects

including a lack of heat, no hot water tank, broken windows, a broken door, water running through the bedroom, an improperly seated and leaking toilet, a leaking sink in the bathroom, broken water pipes in the yard and termites in the basement." 83 Wn.2d at 24-25. In other words, the dwelling was almost certainly uninhabitable.

In contrast, in *Klos v. Gockel*, we held that a damaged patio and backyard did not render the dwelling sufficiently "uninhabitable." 87 Wn.2d 567, 571-72, 554 P.2d 1349 (1976). Since the house remained habitable, we held that the implied warranty had not been breached. *Id.* at 571-72 ("The law of implied warranty is not broad enough to make the builder-vendor of a house absolutely liable for all mishaps occurring within the boundaries of the improved real property."). We have since explained that courts should evaluate the implied warranty of habitability on "a case-by-case basis." *Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 520, 799 P.2d 250 (1990) (holding that claimed violations of the fire code might affect habitability and must survive summary judgment). But no case-by-case analysis has been conducted here, because the implied warranty of habitability is not at issue.

In short, our precedent does not dictate that Cove necessarily breached the implied warranty of habitability by failing to replace the rotted balcony railing.

Nor is it clear that a nontenant may rely on the implied warranty to recover in a personal injury suit. Since I would wait for those issues to present themselves before we decide them, I do not join the majority opinion on this point.

CONCLUSION

The trial court abused its discretion by excluding Gerlach's BAC and Dr. Vincenzi's testimony. I dissent from the majority on this point and would affirm the Court of Appeals.

Although I concur in the majority's analysis of the RLTA, I do not join its unnecessary discussion of the implied warranty of habitability. I therefore respectfully concur in part and dissent in part.

_____
Gordon McCloud, J.

Wiggins, J PT

Madsen, J.