**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| RAYMOND BUDD and VICKIE BUDD, Husband and Wife,<br><br>      Respondents,<br><br>  v.<br><br>KAISER GYPSUM COMPANY, INC.;<br><br>      Appellant,<br><br>BORGWARNER MORSE TEC INC.; CERTAINTEED CORPORATION; DAP, INC.; FORD MOTOR COMPANY; HONEYWELL INTERNATIONAL INC., Individually and as successor to Allied Signal, Inc. and The Bendix Corporation; METROPOLITAN LIFE INSURANCE COMPANY; MW CUSTOM PAPERS, LLC; PFIZER INC.; UNION CARBIDE CORPORATION; and WEYERHAEUSER COMPANY,<br><br>      Defendants. | No. 81918-6-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

CHUN, J. — Raymond Budd developed mesothelioma after working with a drywall product called "joint compound" from 1962 to 1972. He sued Kaiser Gypsum Company, Inc. and others for damages, contending that the company's joint compound caused his illness. A jury returned a verdict in Budd's favor and awarded him nearly $13.5 million. Kaiser appeals, claiming (1) insufficient randomness in the jury-selection process, (2) erroneous transcription of expert testimony, (3) lack of proximate causation, (4) lack of medical causation, (5) an

improper jury instruction on defective design, (6) improper exclusion of sexual battery and marital discord evidence, (7) improper admission of post-exposure evidence, (8) improper exclusion of regulatory provisions, and (9) a failure to link its product to Budd's disease. For the reasons below, we affirm.

## I. BACKGROUND

Kaiser manufactured drywall products, including joint compound, from the 1950s to the 1970s. Budd claims he worked with Kaiser's joint compound from 1962 to 1972 when he worked for his father and uncle's drywall business. During that time, Kaiser's joint compound contained Grade 7 chrysotile and Calidria chrysotile. Chrysotile is a type of asbestos. Years later, a doctor diagnosed Budd with mesothelioma.

Budd and his wife sued Kaiser and others in King County Superior Court for negligence and strict liability, advancing failure to warn and defective design theories.

*Jury Selection.* In early 2020, the COVID-19 pandemic halted jury trials at the court. When they resumed, the court and our Supreme Court allowed for the excusal of potential jurors at higher risk from COVID-19 based on their age or health conditions. In this case, the jury services department of King County Superior Court sent summonses to potential jurors who had deferred service before. Before trial, Kaiser challenged the jury selection process, contending that it was not sufficiently random and excluded people ages 60 and older. The trial court denied Kaiser's challenge.

No. 81918-6-I/3

*Evidence of Abuse and Discord.*  Budd moved in limine to exclude evidence that he had sexually abused his daughter and evidence of marital discord.  The trial court denied Budd's motion but said that Kaiser could introduce the evidence only if Budd opened the door.[1]  Budd's wife voluntarily dismissed her loss of consortium claim to avoid opening the door.  During trial, after Budd's wife testified, Kaiser asked to introduce the challenged evidence.  The trial court denied the request, determining that Budd had not opened the door.

*Post-Exposure Evidence.*  Kaiser moved in limine to exclude evidence about asbestos hazards—such as internal Kaiser memoranda—that post-dated Budd's exposure, contending that such evidence was irrelevant to Budd's claims.  The trial court denied the motion.  During trial, Budd introduced post-exposure evidence about asbestos hazards.

*Transcription of Testimony.*  The day of closing arguments, Budd shared his argument slides with Kaiser.  After reviewing the slides, Kaiser told the court that Budd was seeking to rely on a portion of Dr. Davis Weill's testimony that was erroneously transcribed.  The transcript said, "Q.  And, Doctor, has there been any epidemiological literature published in the peer reviewed literature demonstrating an increased risk of mesothelioma from exposure to Calidria? A. Yes."  Kaiser contended the answer was, "No."  It moved to preserve the audio recording of the testimony and requested a copy.  The trial court granted

---

[1] "Opening the door" is described as when "[a]n attorney's conduct or questions" renders "otherwise inadmissible evidence or objectionable questions admissible." BLACK'S LAW DICTIONARY, 1314 (11th ed. 2019).

3

preservation but denied Kaiser's request for a copy.  Kaiser then moved twice to correct the record and the court denied both motions.

*Jury Instruction.*  The court instructed the jury on a negligent failure to warn claim and a strict liability failure to warn claim; it also partially instructed the jury on a design defect claim.  Kaiser objected to the design defect instruction, contending that the case involved only failure to warn claims.  The court gave the instruction.

*Verdict.*  The jury found for Budd and awarded him $13,426,000 in damages.

*Posttrial Motion.*  Kaiser moved for dismissal, new trial, and remittitur under CR 50, CR 59, and RCW 4.76.030 ("Posttrial Motion").  Under CR 50, Kaiser contended that Budd failed to prove he was exposed to a Kaiser product; and proximate causation by showing he would have heeded a warning had one been given.  Kaiser said that under CR 59, the jury selection process did not conform to statutory requirements; Budd failed to prove medical causation and proximate causation; and the court erred in admitting post-exposure evidence, excluding evidence of prior asbestos regulation provisions, excluding evidence of Budd's sexual abuse of his daughter and of marital discord, and instructing the jury on the design defect claim.  The court denied Kaiser's Posttrial Motion.

Kaiser appeals.

## II. ANALYSIS

### A.  Jury Selection

Kaiser says the trial court erred by failing to ensure the jury pool was

sufficiently random under RCW 2.36 et seq. It also says excluding jurors ages 60 and over was reversible error. Budd disagrees and says Kaiser waived its second claim. We conclude that the court substantially complied with the randomness requirement and did not exclude a cognizable class.

We review a "trial court's ruling regarding challenges to the venire process for abuse of discretion." State v. Clark, 167 Wn. App. 667, 674, 274 P.3d 1058 (2012), aff'd, 178 Wn.2d 19, 308 P.3d 590 (2013). We review a trial court's denial of a CR 59 motion also for abuse of discretion. Konicke v. Evergreen Emergency Servs., P.S., 16 Wn. App. 2d 131, 147, 480 P.3d 424, (2021). "A trial court abuses its discretion when its decision 'is manifestly unreasonable or based upon untenable grounds or reasons.'" Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668–69, 230 P.3d 583 (2010) (quoting State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)). An "appellate court cannot hold that a trial court abused its discretion 'simply because it would have decided the case differently.'" Coogan v. Borg-Warner Morse Tec Inc., 197 Wn.2d 790, 804–05, 490 P.3d 200 (2021) (quoting Gilmore v. Jefferson County Pub. Transp. Benefit Area, 190 Wn.2d 483, 494, 415 P.3d 212 (2018)).

1. Randomness

"The [jury-selection] statutes repeatedly mandate that the members of a jury panel be randomly selected." Brady v. Fibreboard Corp., 71 Wn. App. 280, 282, 857 P.2d 1094 (1993) (citing former RCW 2.36.010(6), (9), (12) (2019);[2]

---

[2] Defining "Jury panel" and "Master jury list" as consisting of "randomly selected" people.

No. 81918-6-I/6

RCW 2.36.050;[3] .063;[4] .065;[5] .080(1);[6] .130[7]).  And the trial court must ensure random selection.  Id.  But "the statutory requirements for making up the jury lists are merely directory and need be only substantially complied with."  City of Tukwila v. Garrett, 165 Wn.2d 152, 159, 196 P.3d 681 (2008); see also RCW 2.36.065 ("Nothing in this chapter shall be construed as requiring uniform equipment or method throughout the state, so long as fair and random selection of the master jury list and jury panels is achieved.").  "Prejudice will be presumed only if there is a *material* departure from the statutory requirements. . . . If there is substantial compliance with the statute, then a challenger may claim error only if he or she establishes actual prejudice."  Id. at 161 (alteration in original) (citations omitted).  Our Supreme Court has said,

> The purpose of all these statutes is to provide a fair and impartial jury, and if that end has been attained and the litigant has had the benefit of such a jury, it ought not to be held that the whole proceeding must be annulled because of some slight irregularity that has had no effect upon the purpose to be effected.

W. E. Roche Fruit Co. v. N. Pac. Ry. Co., 18 Wn.2d 484, 487–88, 139 P.2d 714 (1943).

---

[3] Providing for the random selection of juries in courts of limited jurisdiction.

[4] Allowing for the use of an electronic data processing system or device to "compile the master jury list and to randomly select jurors from the master jury list.

[5] Placing the duty of ensuring random selection of jurors on the "judges of the superior court."

[6] Stating that "It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court."

[7] Providing for the random selection of additional jurors as needed.

No. 81918-6-I/7

During a pretrial hearing on August 7, 2020, the trial court explained how its jury services department summoned potential jurors.[8]  Kaiser objected and sought a continuance of trial, contending that the summons process violated statutory randomness requirements.  The trial court reserved ruling and denied the continuance.

On September 1, the trial court addressed the issue at a hearing and in a written ruling.  The court explained that the jury services department mailed summonses to over 1,000 potential jurors; that the potential jurors were those who had had their service deferred before; that each summons requested that the recipient contact the court by e-mail, by phone, or in person; that of those potential jurors, about 183 responded by e-mail; that the jury services department then sent questionnaires to those 183 people by e-mail; that about 77 people responded to the questionnaire; and that those people were placed on the jury list in random order.  The court then overruled Kaiser's objection.  The court later denied Kaiser's Posttrial Motion, which was based in part on its contention that the jury selection process was improper.

Kaiser first contends that the jury pool was insufficiently random because the jury services department mailed summonses to those who had deferred service before.  But there can be numerous reasons why a juror defers service; Kaiser offers no information to suggest that the pool of over 1,000 people was less random than a venire another process would yield nor does it cite authority

---

[8] Kaiser did not include the transcript from this hearing in the appellate record despite discussing what was apparently said at the hearing in is briefing.

supporting such a contention. <u>Cf.</u> <u>State v. Tingdale</u>, 117 Wn.2d 595, 600, 602, 817 P.2d 850 (1991) (holding that a court clerk's excusal, before voir dire, of three potential jurors based on their answers to questionnaires constituted a material departure from the statutory randomness requirements); <u>Brady</u>, 71 Wn. App. at 281, 283 ("the randomness of the panel was destroyed" when "two judges, neither of whom was the trial judge," eliminated 14 potential jurors based on their answers to questionnaires).

Kaiser next contends that the jury pool was not sufficiently random because the jury services department sent questionnaires only to those for whom it had e-mail addresses. But the court's comments make clear that those were the potential jurors who had responded to the mailed summons, and the record does not suggest that any potential jurors responded through another mode of communication. In other words, the jury services department did not unilaterally decide to contact only potential jurors with e-mail addresses. Kaiser also emphasizes that only a trial court, not the jury services department, has the power to excuse jurors for cause. But the jury services department did not excuse jurors for cause; it sent summonses to potential jurors who had deferred service before and then sent questionnaires to potential jurors who responded to the summons. Kaiser does not cite authority supporting its contention that this rendered the jury selection process insufficiently random. <u>See</u> <u>Norcon Builders, LLC v. GMP Homes VG, LLC</u>, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (holding that appellate courts will not consider arguments unsupported by authority).

8

The court acted within its discretion in rejecting Kaiser's challenges to the jury selection process as not sufficiently random because it substantially complied with the statute. See W. E. Roche, 18 Wn.2d at 487–88 (holding that courts substantially comply with the statute if it ensured the effectuation of the purpose of the statutory randomness requirement, which is to ensure each party receives an unbiased trial). Kaiser does not show how the court's selection of a jury from those who had deferred service before and those who responded by e-mail to summonses was insufficiently random. And Kaiser does not contend it was prejudiced, it instead contends that prejudice is presumed because the court materially deviated from the statute. But given the trial court's substantial compliance with the statute, Kaiser can prevail on this issue only if it shows actual prejudice. Thus, its arguments on randomness fail.

2. Cognizable class

"The Sixth and Fourteenth Amendments prohibit the systematic exclusion of distinctive groups from jury pools." Clark, 167 Wn. App. at 673. "[E]ven if the source list is not unconstitutionally discriminatory, a selection procedure is still invalid if it systematically excludes a cognizable class of individuals." Id. at 674.

Because of the COVID-19 pandemic, the court suspended jury trials in early 2020. When jury trials resumed, the presiding superior court judge sent a memorandum to bar associations saying that jurors could be excused from jury duty if they are "age 60 or older *and* [] do not wish to report for jury duty." (Emphasis added.) A Supreme Court order about modification of jury trial proceedings similarly stated, "Any process for summoning potential jurors must

9

include *the ability to defer* jury service by those who are at higher risk from COVID-19 based on their age or existing health conditions." (Emphasis added.) The court continued, "However, no identified group may be per se excused from jury service on this basis." This policy was implemented via the questionnaire the jury services department distributed. Citing this policy change, Kaiser moved to continue the trial, which motion the trial court denied.

Kaiser says the jury selection process was invalid because it constructively excluded a cognizable class of individuals: people ages 60 and older.[9] But to be unconstitutional, the exclusion must be "systematic." Clark, 167 Wn. App. at 673. Kaiser cites no law that "constructive" exclusion is sufficient. The policy allowed for jurors to be excused if they were 60 years or older *and* did not wish to report for duty. This did not automatically exclude every person 60 years and older. The court acted within its discretion in rejecting Kaiser's challenges to the jury selection process.

B. Transcript Error

Kaiser says the trial court erred by denying its request for a copy of an audio recording from its expert's testimony, which it claims was erroneously transcribed. It says the trial court also erred by denying its later motion to correct the record. Finally, Kaiser says Budd's counsel engaged in misconduct by

---

[9] Budd contends Kaiser implicitly withdrew its objections on this issue by saying it did not want to force potential jurors over the age of 60 who were claiming hardship to appear. But Kaiser also said it was not conceding its challenge. Budd also says Kaiser explicitly withdrew its objections when it stated, "[T]his motion wasn't premised on exclusion of a cognizable class. This is premised on the deviation from the RCW 2.36 series." But that comment was about the randomness issue addressed above. Kaiser preserved its objection to the exclusion of people age 60 and older in a pretrial motion and we address this issue.

10

No. 81918-6-I/11

referring to evidence outside the record by using the erroneous transcription during closing argument. We conclude that (1) the court acted within its discretion in denying Kaiser's request for a copy of the recording, (2) even if the transcript were incorrectly transcribed, Kaiser is not entitled to a new trial because its RAP 9.5 motion to correct the record post-dated the jury's verdict, and (3) even if there was any misconduct, it was harmless.

The court exercised its discretion in addressing Kaiser's motions and objection related to the transcript. We review this issue for abuse of discretion.[10] See, e.g., Hollins v. Zbaraschuk, 200 Wn. App. 578, 582–83, 402 P.3d 907 (2017) (reviewing a "classic discretionary decision" for abuse of discretion).

During its direct examination of its expert, Dr. Weill, Kaiser asked whether any epidemiological studies linked Calidria chrysotile to mesothelioma. The transcript says that Dr. Weill responded, "Yes." The day of closing arguments, and before the opening segment of Budd's closing, Budd shared his argument slides with the defense. Based on its review of Budd's slides, Kaiser objected and, at a sidebar, contended that Budd sought to rely on an erroneously transcribed transcription. Apparently, during the sidebar, the trial court did not prohibit Budd from referring to or using the transcript. During the opening segment of Budd's closing argument, he stated that Dr. Weill had said "yes" in response to the question and that it was undisputed that Calidria causes

---

[10] Budd says the matter is reviewed for substantial evidence, but Kaiser does not assign error to any findings of fact, nor does it discuss any such findings in its analysis. See Merriman v. Cokeley, 168 Wn.2d 627, 631, 230 P.3d 162 (2010) ("An appellate court reviews a trial court's findings of fact for substantial evidence in support of the findings.").

11

mesothelioma. Kaiser objected again after the opening segment of Budd's closing argument. The court said it could not simply declare the transcript incorrect at that moment and that they would "have to move on." During its closing argument, Kaiser said to the jury that it heard Dr. Weill answer "No" to the question and that the court reporter heard him say "Yes" and that the jury should consult its own notes on the issue. During rebuttal closing argument, Budd showed the jury a slide containing the contested statement in the transcript. The jury then returned its verdict.

Upon learning that an audio file of the testimony existed, on September 9, Kaiser moved to preserve the file and requested a copy for forensic analysis. The court granted the motion to preserve but denied the motion for a copy, saying that it was concerned that doing so would create a troubling precedent for stall tactics. The court also said that the jurors had their own memory of what Dr. Weill said, and that it instructed the jurors that Dr. Weill's testimony was evidence, and what counsel said during closing was not evidence.

On October 19, Kaiser moved to correct the record under RCW 2.32.250. The court denied the motion, saying that it was moot because the jury had issued a verdict and correction would not change the verdict.

While this appeal was pending, in February 2021, Kaiser moved below for a fact-finding hearing and to amend the transcript pursuant to RAP 9.5(c). The court held a hearing during which it heard the recording and testimony from Dr. Weill, Budd's counsel, and Kevin Moll, the court reporter who transcribed the testimony. Dr. Weill testified he remembered saying "No" and he maintained his

12

answer after hearing the recording. Budd's counsel testified that she heard Dr. Weill say "yeah" and Moll testified that he heard Dr. Weill say "yes." The trial court concluded that the transcript correctly reflected a "Yes" answer and found that Budd's counsel and Moll were more credible than Dr. Weill. The court denied Kaiser's RAP 9.5(c) motion.

First, Kaiser says the trial court abused its discretion by denying its request for a copy of the audio recording for forensic analysis. But Kaiser cites no law suggesting that it was entitled to this. See Norcon, 161 Wn. App. at 486 (holding that appellate courts will not consider arguments unsupported by authority). And though Kaiser contends that the trial court did not explain its decision, the court did explain that it was wary of setting a precedent that may allow for stall tactics. The court did not abuse its discretion by denying Kaiser's request.

Second, Kaiser says the trial court abused its discretion by ignoring the audio recording and Dr. Weill's testimony, and instead relying on Budd's counsel's and Moll's testimonies in finding that the transcript was correctly transcribed. Budd says whether the transcript was properly transcribed has "no bearing on this appeal" because a finding of error on this posttrial motion would not affect the jury's verdict. Budd is correct. Kaiser's motion to preserve the recording, and its two motions to correct the record all post-date the jury's verdict. Even if the court had ruled in Kaiser's favor for those motions, it could

13

not have changed the jury's verdict. Thus, Kaiser should not obtain the remedy it seeks—a new trial—based on the court's ruling on Kaiser's RAP 9.5 motion.[11]

Third, citing Carnation Company, Inc. v. Hill, Kaiser contends that Budd's counsel committed misconduct by referring to evidence not in the record when they used the transcript in their slides. 115 Wn.2d 184, 186, 796 P.2d 416 (1990) (addressing a claim that an attorney committed misconduct by arguing facts outside the record). But the trial court apparently allowed the conduct: Kaiser objected to the transcript before Budd's closing argument and the court seemingly overruled the objection. Yet even assuming misconduct, "[i]n order to constitute reversible error, moving counsel must show the attorney misconduct had a substantial likelihood of affecting the jury's verdict." Id. Kaiser brought the issue to the jury's attention during its closing argument and encouraged the jury to refer to its notes. And as discussed below in the medical causation section, other evidence linked Budd's mesothelioma to chrysotile exposure. Also, as the trial court noted in its ruling, it had instructed the jury that the lawyers' comments during closing argument are not evidence. And "'jurors are presumed to follow the court's instructions.'" Coogan, 197 Wn.2d at 807 (quoting State v. Emery, 174 Wn.2d 741, 766, 278 P.3d 653 (2012)). Thus, Budd's use of the transcript during closing did not have a substantial likelihood of affecting the jury's verdict.

---

[11] Kaiser appears to challenge the trial court's denial of its RCW 2.32.250 motion to correct the record in its reply brief. This challenge similarly does not support a new trial. And we do not address arguments raised for the first time in a reply brief. See Samra v. Singh, 15 Wn. App. 2d 823, 834 n.30, 479 P.3d 713 (2020) ("We do not address matters raised for the first time in reply briefs.").

No. 81918-6-I/15

C. Proximate Cause

Kaiser says the trial court erred in denying its Posttrial Motion because Budd failed to prove proximate cause—specifically, cause in fact—for his failure to warn claims. Kaiser says no evidence shows what an adequate warning would have contained and no substantial evidence shows Budd would have heeded a warning had Kaiser given one. Budd responds that, though he did not have to provide evidence about what an adequate warning should have contained, he did provide such testimony. And he says that substantial evidence shows that he would have heeded a warning. We conclude that the trial court did not err.

We review de novo a trial court's decision to deny a CR 50 motion. Paetsch v. Spokane Dermatology Clinic, P.S., 182 Wn.2d 842, 848, 348 P.3d 389 (2015). A judgment as a matter of law is appropriate only when, after viewing the evidence in favor of the nonmoving party, a court can say, "'as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party.'" Id. (quoting Indus. Indem. Co. of Nw. v. Kallevig, 114 Wn.2d 907, 915–16, 792 P.2d 520 (1990)). "The requirement of substantial evidence necessitates that the evidence be such that it would convince 'an unprejudiced, thinking mind.'" Kallevig, at 916 (quoting Hojem v. Kelly, 93 Wn.2d 143, 145, 606 P.2d 275 (1980)).[12]

---

[12] We review a trial court's denial of a CR 59 motion for abuse of discretion. Konicke, 16 Wn. App. 2d at 147. Because the standard of review for a CR 50 ruling is less deferential, if a trial court did not err in its denial of a CR 50 motion on an issue, it did not abuse its discretion by denying a CR 59 motion on the same issue. See Bellevue Farm Owners Ass'n v. Stevens, No. 79430-2-I, slip op at 7 n.4, (Wash. Ct. App.

15

For strict liability and negligence claims, a plaintiff must establish proximate cause between the defect or breach and the injury. Lewis v. Scott, 54 Wn.2d 851, 856, 341 P.2d 488 (1959) (negligence); Novak v. Piggly Wiggly Puget Sound Co., 22 Wn. App. 407, 410, 591 P.2d 791 (1979) (strict liability). "To show proximate causation, the plaintiff must show both cause in fact and legal causation." Ayers v. Johnson & Johnson Baby Prod. Co.,117 Wn.2d 747, 753, 818 P.2d 1337 (1991). "'Cause in fact refers to the "but for" consequences of an act—the physical connection between an act and an injury.'" Id. (quoting Hartley v. State, 103 Wn.2d 768, 778, 698 P.2d 77 (1985)). In a failure to warn case, a showing that the plaintiff would have heeded a warning had one been given can establish cause in fact. See id. at 754.

The parties do not dispute that during the time of Budd's exposure, Kaiser's joint compound lacked a warning. During trial, Budd asked his expert, Dr. Edwin Holstein, what an adequate warning would look like for a product containing asbestos. Dr. Holstein replied,

> Well, you'd want to have it in writing on the product prominently, not in small letters, but in big letters. You would want to have it in several languages. And you would want to have a graphic, as well, like a skull and crossbones, kind of logo, that people would recognize that there is a hazard.

Budd testified about how he prepared, applied, and finished joint compound during his drywall work. He also introduced Kaiser documents showing

---

Feb. 10, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/794302.pdf. ("Because the trial court vacated the sanctions under the more deferential standard, we assume it also would have vacated them had it exercised de novo review."); see GR 14.1(c) ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions.").

instructions for using its joint compound, which tracked his testimony. Kaiser introduced Budd's interrogatory answers, which said that he used to smoke cigarettes and that he had read the warnings for those cigarettes.

1. Content of warning

The requirement that a plaintiff show what an adequate warning would have looked like—to which Kaiser refers—comes from the "Washington Product Liability Act" (WPLA). See RCW 7.72.030(b). But the legislature enacted the WPLA in 1981, and the Act does not apply "[w]here the harm results from exposure, and it appears that substantially all of the injury-producing events occurred prior to . . . 1981." Krivanek v. Fibreboard Corp., 72 Wn. App. 632, 635, 865 P.2d 527 (1993). Budd's exposure period ended in 1972 and so the WPLA does not apply.

Moreover, contrary to Kaiser's contention, substantial evidence—through Dr. Holstein's testimony—shows what an adequate warning would have contained. Kaiser says that Dr. Holstein was not qualified to offer such testimony but failed to object on this ground. See Mut. of Enumclaw Ins. Co. v. Day, 197 Wn. App. 753, 769, 393 P.3d 786 (2017) ("'Failure to raise an issue before the trial court generally precludes a party from raising it on appeal.'" (quoting Smith v. Shannon, 100 Wn.2d 26, 37, 666 P.2d 351 (1983)); RAP 2.5.

2. Heeding the warning

Kaiser says no substantial evidence shows Budd would have heeded a warning had it given one. Budd disagrees, arguing that his testimony about how he used joint compound tracked the product's instructions, which shows that he

would have read and heeded a warning. Kaiser says that Budd's argument fails because it relies on an inference that Budd read the instructions, and an inference that since he read and followed the instructions, he would have similarly heeded a warning.[13] But evidence, when viewed in the light most favorable to the non-moving party, can sustain a jury's verdict based on reasonable inferences from that evidence. Kallevig, 114 Wn.2d at 915–16. The inference that Budd read and followed the joint compound instructions is reasonable based on Budd's use conforming to those instructions. And the inference that Budd would have heeded a warning is also reasonable given the inference that he read and followed the joint compound directions. See Ayers, 117 Wn.2d at 754 (holding that the jury was "entitled to infer" that the plaintiff would have heeded a warning on baby oil, based on testimony that the plaintiff read warnings on other household products and treated them carefully). In Ayers, the court noted that the plaintiff did not know of the risks of aspirating baby oil; here, not only did Kaiser fail to warn buyers about the dangers of asbestos, it did not inform buyers that the product contained asbestos. Id. at 755. The court did not err in denying Kaiser's Posttrial Motion because substantial evidence and reasonable inferences from it support a finding of cause in fact.

---

[13] Kaiser also contends that the fact that Budd smoked cigarettes despite reading the warning labels on them shows that he would not have heeded a warning on the joint compound. Given the differences between smoking an addictive substance and using a particular product in the course of employment, we reject this contention. See Raney v. Owens-Illinois, Inc., 897 F.2d 94, 96 (2d Cir. 1990) (holding that evidence the plaintiff smoked in a failure to warn asbestos case did "not preclude a finding in plaintiff's favor"). Moreover, this evidence shows that Budd reads warnings. The evidence, viewed in Budd's favor, sustains the jury's verdict.

D. Medical Causation

Kaiser says the trial court erred in denying its Posttrial Motion because Budd failed to prove medical causation. Kaiser claims that to recover, Budd needed to produce epidemiological and toxicological studies establishing causation between Grade 7 chrysotile and Calidria chrysotile—the types of chrysotile Kaiser used in its joint compound—and mesothelioma. Budd responds that he based his lawsuit on the theory that all types of chrysotile can cause mesothelioma and that he provided evidence proving that theory. We conclude the court did not abuse its discretion.

We review a trial court's denial of a CR 59 motion for abuse of discretion. Konicke, 16 Wn. App. at 147.

"[T]he plaintiff in a product liability or negligence action bears the burden to establish a causal connection between the injury, the product and the manufacturer of that product." Morgan v. Aurora Pump Co., 159 Wn. App. 724, 729, 248 P.3d 1052 (2011) (citing Lockwood v. AC & S, Inc., 109 Wn.2d 235, 245, 744 P.2d 605 (1987)).

During trial, Budd's expert, Dr. Arnold Brody, agreed that epidemiological studies combined with toxicological studies are necessary to prove disease causation "for populations." Budd's expert, Dr. Holstein, testified that "if you want to investigate whether drywall work can lead to the development of mesothelioma, epidemiology is the wrong tool," because of the nature of the job. Dr. Holstein said that epidemiologists have studied chrysotile more generally, rather than just among drywall workers, and found that chrysotile is linked to

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

mesothelioma.  Dr. Holstein also testified about "a long list of epidemiological studies that find that chrysotile asbestos can and does cause malignant mesothelioma in human beings" and about a joint statement saying that "all types of asbestos fiber are causally implicated in the development of various diseases and premature death" from sources he found reliable and authoritative.  Dr. Brent Finley, Kaiser's expert, testified about three toxicological studies on Grade 7 chrysotile showing that there was no causal link between Grade 7 chrysotile and an increased risk of disease in rats and primates.

Kaiser contends that Budd's expert, Dr. Brody, testified that proof of disease causation through exposure to a specific substance requires epidemiological studies showing an increased risk of disease plus toxicological studies showing an increased risk of disease.  Kaiser says that by not producing such studies about Grade 7 chrysotile and Calidria chrysotile, or drywall workers, Budd has not proved causation.  This misconstrues Dr. Brody's testimony. Dr. Brody made it clear that this was the case for assessing *populations* as whole.  Dr. Brody did not say that this was the case for individuals, nor did he say the studies must be specific to a type of chrysotile rather than chrysotile as a whole.

Kaiser contends that Dr. Holstein's testimony—that there were no epidemiological studies assessing an increased risk of disease among drywall workers using chrysotile joint compound—combined with Dr. Brody's testimony, is fatal to Budd's claims.  Kaiser emphasizes a study that notes that asbestos exposure and type differ between professions and that all workers cannot be

20

referred to broadly as "asbestos workers."  But again, Kaiser misconstrues

Dr. Brody's testimony about whether such studies would be required to prove

causation in this case.  And Dr. Holstein also explained the lack of

epidemiological studies of drywall workers: he noted the difficulty of conducting

such studies given the rarity of the disease, the latency period, and the fact that it

is harder to document exposure from drywall work since it is often done

sporadically or alongside other jobs.  Budd thus offered evidence explaining the

lack of epidemiological studies assessing an increased risk of disease among

drywall workers using chrysotile joint compound.  Budd also offered evidence

that epidemiological studies show that chrysotile causes mesothelioma.

Kaiser also says that no expert identified a toxicological study showing

increased risk of mesothelioma from Grade 7 chrysotile or Calidria chrysotile.  It

emphasizes that its expert, Dr. Finley, testified that toxicological studies have

shown that Grade 7 chrysotile does not lead to an increased risk of

mesothelioma in rats and primates.  But Dr. Finley's testimony it only addresses

Grade 7 chrysotile, not Calidria chrysotile.  Budd produced toxicological evidence

that chrysotile causes mesothelioma.  Looking at the evidence as a whole, the

trial court's decision is not "'manifestly unreasonable or based upon untenable

grounds or reasons.'"  Salas, 168 Wn.2d at 668–69 (quoting Stenson, 132 Wn.2d

at 701).

E.  Jury Instructions

Kaiser says the trial court erred by giving the jury a design defect

instruction because the joint statement of the case provides that the claims at

21

issue were negligent failure to warn and strict liability failure to warn. Budd responds that the joint statement of the case did not so limit his claims, and that even if it did, a design defect claim was implicitly agreed to by the parties during trial. We conclude that the joint statement here did not exclude Budd's design defect claim and the trial court did not commit reversible error.

We review de novo claimed errors of law in jury instructions. Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160, 151 Wn.2d 203, 210, 87 P.3d 757 (2004). "Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law." Id. When a trial court gives an erroneous instruction "'on behalf of the party in whose favor the verdict was returned,'" we presume prejudice unless the error affirmatively appears harmless. State v. Barry, 183 Wn.2d 297, 303, 352 P.3d 161 (2015) (quoting State v. Wanrow, 88 Wn.2d 221, 237, 559 P.2d 548 (1977)). "'A harmless error is an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case.'" Nguyen v. City of Seattle, 179 Wn. App. 155, 159 n.2, 317 P.3d 518 (2014) (quoting Wanrow, 88 Wn.2d at 237).

Under pre-WPLA law, a defendant is liable under a design defect theory if their product, when manufactured as designed, is not reasonably safe, meaning the product is "unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer." Seattle-First Nat'l Bank v. Tabert, 86 Wn.2d 145, 154, 542 P.2d 774 (1975). A defendant is liable under strict liability

22

failure to warn when their failure to warn renders their product unreasonably

dangerous.  Little v. PPG Indus., Inc., 19 Wn. App. 812, 818, 579 P.2d 940

(1978).

> The joint statement says
>
> Plaintiff alleges that Kaiser Gypsum was negligent in failing to warn and that its *joint compound products were unreasonably dangerous or defective insofar as they lacked adequate warnings* on use and how to protect Raymond Budd.
>
> . . .
>
> Kaiser Gypsum denies that it was negligent in failing to warn and *denies that its products were unreasonably dangerous or defective.*

(Emphasis added.)  Jury instruction 12 says,

> The Plaintiff brings this action on the basis of two separate and distinct legal claims:
>
> > A. Products Liability and
> >
> > B. Negligence
>
> . . .
>
> With respect to the Plaintiff's product liability claims, Plaintiff claims that Defendant Kaiser Gypsum Company, Inc. manufactured, distributed, or supplied products that were not reasonably safe for use because:
>
> 1. These products contained asbestos, which is not reasonably safe to human life and health, and
>
> 2. These products did not contain adequate warnings of the dangers involved with the product's use.

Kaiser objected to Instruction 12, saying that it encompassed more than the two

failure to warn claims at issue in the case.  Other instructions address the

elements of a strict liability failure to warn claim and a negligent failure to warn

claim and define key terms for the two claims.  But no other instructions

addressed the elements of a strict liability design defect claim.  The verdict form

included three claims: strict liability failure to warn, strict liability design defect,

and negligent failure to warn. Kaiser objected to the inclusion of a design defect claim on the verdict form. The court gave the jury instruction 12 and the verdict form over Kaiser's objections. The jury returned a verdict in Budd's favor on all three claims.

Kaiser cites no law supporting its contention that a joint statement can limit a party's claims. See Norcon, 161 Wn. App. at 486 (holding that appellate courts will not consider arguments unsupported by authority). But even if that were the case, the language of the joint statement could fairly be interpreted to include a design defect claim.[14]

The trial court may have failed to "properly inform the jury of the applicable law" by providing only partial instructions on the design defect claim but still including the claim on the verdict form. Blaney, 151 Wn.2d at 210. But Kaiser did not object on this basis. And so we need not address the issue. See Day, 197 Wn. App. at 769 ("'Failure to raise an issue before the trial court generally precludes a party from raising it on appeal.'" (quoting Smith, 100 Wn.2d at 37)); RAP 2.5. Nor need we address it because Kaiser raises for the first time in their reply brief on appeal. Samra v. Singh, 15 Wn. App. 2d 823, 834 n.30, 479 P.3d 713 (2020) ("We do not address matters raised for the first time in reply briefs.").

And even if Kaiser had preserved the issue, any error was harmless. See Nguyen, 179 Wn. App. at 159 n.2 ("'A harmless error is an error which is trivial,

---

[14] "Plaintiff alleges that Kaiser Gypsum . . . joint compound products were *unreasonably dangerous* or defective insofar as they lacked adequate warnings on use and how to protect Raymond Budd. . . . Kaiser Gypsum . . . denies that its products were *unreasonably dangerous* or defective." (Emphasis added.)

24

or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case.'" (quoting Wanrow, 88 Wn.2d at 237)). The jury returned a verdict in Budd's favor on all three claims. The jury's award of damages does not turn on its design defect decision. Instead, the jury based its award on Budd's injuries, which relate to all three claims. See Mavroudis v. Pittsburgh-Corning Corp., 86 Wn. App. 22, 36, 935 P.2d 684 (1997) (affirming despite instructional error where "the error was harmless because the jury rendered a single monetary verdict on both the strict liability product-warning claim and the negligent failure-to-warn claim"). It is clear the jury concluded that Budd's injuries were caused by the failure to warn as well as a design defect. Kaiser contends any instructional error was prejudicial because a finding of product defect likely made the jury believe a warning was thus required. But the court fully instructed the jury on the law for the failure to warn claims. And the jury is presumed to have followed the instructions. Coogan, 197 Wn.2d at 807 ("jurors are presumed to follow the court's instructions." (quoting Emery, 174 Wn.2d at 766)).

F.   Sexual Battery and Marital Discord Evidence

Kaiser says the trial court erred by excluding evidence of Budd's past sexual abuse of his daughter, marital infidelity, and since-rescinded petitions for divorce. It contends that such evidence is relevant to rebut Budd's loss of enjoyment of life claim because it shows strained familial relationships. Budd responds that the court acted within its discretion because he did not open the door to the admission of such evidence. We agree with Budd.

25

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." Salas, 168 Wn.2d at 668.

"All relevant evidence is admissible unless its admissibility is otherwise limited." Id. at 669; ER 402. Even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. Trial courts have "'wide discretion'" in weighing the probative value of evidence against its potentially prejudicial impact. Gerlach v. Cove Apartments, LLC, 196 Wn.2d 111, 120, 471 P.3d 181 (2020) (quoting Salas, 168 Wn.2d at 671). "'When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists.'" Id. (quoting Salas, 168 Wn.2d at 671). "Though rare, the danger of unfair prejudice can exist even when the evidence at issue 'is undeniably probative of a central issue in the case.'" Id. (quoting Carson v. Fine, 123 Wn.2d 206, 224, 867 P.2d 610 (1994)).

Budd moved in limine under ER 403 to exclude evidence that he was convicted of sexual battery against his daughter and evidence of marital issues, including his wife's infidelity after the abuse, and since-rescinded petitions for divorce. The trial court denied his motion. But the court explained that it would not admit the challenged evidence unless Budd opened the door. The court wrote,

> By way of example, if the Plaintiff testifies or presents other evidence that he formerly enjoyed being with his family members (including his grandchildren), and that his current illness prevents him from interacting with his family members (including his grandchildren) as he once did. . . . such evidence may not be a basis for Kaiser to offer the Challenged Evidence in rebuttal.

26

> But if the Plaintiff goes further and presents substantial additional evidence (from other witnesses, or otherwise) focusing on a theme that Mr. Budd is a quintessential "family man" and that he and his wife have an ideal marriage (with the implication that its termination at his death should justify an award of noneconomic damages), or that his wife, children, or grandchildren have lost or will lose things that could be described as being consistent with "care, maintenance, services, support, advice, counsel, therapy and consortium which [they] would have received before his illness and disability caused by his exposure to asbestos" . . . , then that may justify Kaiser in arguing . . . that Kaiser . . . should be permitted to rebut such evidence by presenting the Challenged Evidence.

Budd's wife voluntarily dismissed her loss of consortium claim to avoid opening the door for the challenged evidence.

During trial, Budd testified that he used to ride bicycles with his grandson, travel with his wife and grandchildren, and do woodwork, and that because of his illness he could no longer do those things. He introduced photos of himself riding a bicycle and at an amusement park with his grandson. Budd's wife testified similarly about those activities and how Budd could no longer do them. After Budd's wife's testimony, Kaiser sought to cross-examine her about the challenged evidence, claiming Budd had opened the door. The trial court denied Kaiser's request, determining that Budd had not opened the door.

As the court noted, the evidence Budd presented focused on what he enjoyed doing before his illness and what he could no longer do. The challenged evidence may be probative to rebut a claim that his family members have lost something because of his injury, but he did not offer such evidence. Kaiser likens this case to State v. Crenshaw, 98 Wn.2d 789, 806, 659 P.2d 488 (1983), in which the court affirmed the trial court's holding that gruesome photographs of a murder victim's body were so highly probative to the central issues of the

27

case—such as the extent to which the defendant tried to hide the corpse—that they were admissible despite risk of prejudice. The evidence here does not approach this level of probative value. Even assuming the challenged evidence is probative to the issue of loss of enjoyment of life, evidence that Budd sexually abused his daughter and experienced marital discord is "likely to stimulate an emotional response rather than a rational decision." Gerlach, 196 Wn.2d at 120 (quoting Salas, 168 Wn.2d at 671). We conclude that the trial court acted within its discretion.

G. Post-Exposure Evidence and Illustrative Exhibit

Kaiser says the trial court erred by admitting post-exposure evidence about asbestos hazards. It also says that the court erred in allowing the jury to see part of an illustrative exhibit for the first time during closing argument. We conclude the court acted within its discretion on both.

1. Post-exposure evidence

Kaiser moved in limine to exclude any post-exposure evidence. The court denied the motion. During trial, Kaiser claimed that its "asbestos-containing joint compound" was a safe product and would be a safe product if still sold today. Budd presented a variety of post-exposure evidence about knowledge of asbestos hazards and causation. The trial court later explained that it denied Kaiser's motion because "Kaiser is contending in this case, . . . that its compound, in fact, was not and never was toxic" and that by so contending, "Kaiser has put directly at issue whether chrysotile is toxic or not, and that opens up the door to all the evidence on that subject post '71."

28

No. 81918-6-I/29

Kaiser suggests that the only basis for admitting the post-exposure evidence is to support a continuing duty to warn claim, which claim Kaiser says is unsupported. But as the trial court explained, it admitted such evidence because Kaiser put the safety of its asbestos-containing joint compound at issue. In a strict liability negligent failure to warn case, "[s]trict liability may be established if a product, though faultlessly manufactured, is unreasonably dangerous when placed in the hands of the ultimate user by a manufacturer without giving adequate warnings concerning the manner in which to safely use it." Novak, 22 Wn. App. at 412. And in a strict liability design defect case, a plaintiff may recover "if the jury determines that the product is dangerous to an extent beyond that which is contemplated by the ordinary consumer." Lenhardt v. Ford Motor Co., 102 Wn.2d 208, 211–12, 683 P.2d 1097 (1984). Kaiser's position at trial was not simply that it thought the product was safe when it sold it; it asserted that the product, even if sold today, is safe. Thus, Kaiser opened the door to evidence to the contrary. The court acted within its discretion by admitting the post-exposure evidence and denying Kaiser's Posttrial Motion on that basis.

2. Illustrative exhibit

During the opening segment of his closing argument, Budd included a page of a National Institute for Occupational Safety & Health (NIOSH) document in his slides. The court had previously admitted the NIOSH document as a whole as an illustrative exhibit,[15] but the jury had not seen that specific page. The

---

[15] The parties do not identify where in the record the court made such a ruling, but they do not dispute that this occurred.

29

specific page was also in a PowerPoint document, which the court admitted as an illustrative exhibit, though the specific page was apparently not shown to the jury at that time. Kaiser objected to the use of that page in Budd's closing argument.[16] The court overruled the objection, stating, "My ruling was that if it was admitted for illustrative purposes, I was going to allow both parties to use the illustrative exhibits during closing arguments. All of the illustrative exhibits, not just the portions that happened to have been shown to the jurors during examination."

The court acted within its discretion by allowing Budd to show an unseen portion of a NIOSH document—which document the court had admitted before as an illustrative exhibit—to the jury during closing argument. Kaiser contends that showing the unseen portion of the NIOSH document was attorney error because it asked the jury to consider items not in evidence. But the court had admitted the whole document as an illustrative exhibit. And Kaiser does not contend that the court's admission of the whole document as an illustrative exhibit was in error nor does it cite law to suggest that a jury may not see a portion of an otherwise admitted illustrative exhibit for the first time during closing argument. Kaiser contends, citing King County v. Farr, 7 Wn. App. 600, 612–13, 501 P.2d 612 (1972), that illustrative exhibits must be admitted in connection with the testimony of a witness. But the court in Farr addressed the necessity of

---

[16] Budd also contends that Kaiser waived its argument about the inclusion of the NIOSH document in Budd's closing slides by waiting to bring it up until after Budd finished with his closing argument. But Kaiser did raise the issue in a sidebar before Budd's closing argument and reiterated its objection on the record after, so Budd's waiver argument lacks merit.

testimony to establish the accuracy of a map before it could be admitted as an illustrative exhibit. Id. at 613. The exhibit here was a NIOSH document, not a map. Moreover, the PowerPoint slide containing the pertinent page of the NIOSH document was introduced with witness testimony. The court's decision was not unreasonable or based on untenable grounds or reasons.

H. WAC Provisions

Kaiser says the trial court erred by excluding evidence of regulatory standards in effect at the time of Budd's alleged exposure. Budd responds that the court acted within its discretion in excluding the evidence, particularly because Budd did not know Kaiser would introduce the evidence through its expert's testimony until the evening before. We conclude that the trial court acted within its discretion, and even if it did not, any error was harmless.

Kaiser sought to have its expert industrial hygienist, Brooke Simmons, testify about WAC provisions from the time of Budd's exposure that regulated dust concentrations at worksites. The provisions specifically provided that asbestos dust concentrations must be kept below five million particles per cubic feet. Budd objected to the admission of the WAC provisions, arguing they were irrelevant and prejudicial and emphasizing that he was not notified of their use until the night before Simmons was set to testify. Budd said the provisions would confuse the jury about the governing law. Budd also said that when he deposed Simmons before trial and asked her about the basis of her opinions, she did not list the WAC provisions as something she relied on. The court expressed concern that the WAC provisions referred to statutory provisions not in the record

31

and that the provisions were thus being presented in a vacuum. The court

excluded the evidence saying, "[T]o the extent [Simmons] didn't rely on it until

tonight or this morning, that's not fair to plaintiffs."

Citing Chen v. City of Seattle, Kaiser contends that the WAC provisions

are relevant because it shows the standard of care applicable to it at the time of

the exposure. 153 Wn. App. 890, 908, 223 P.3d 1230 (2009) ("'Liability for

negligence does not require a direct statutory violation, though a statute,

regulation, or other positive enactment may help define the scope of a duty or the

standard of care.'" (quoting Owen v. Burlington N. & Santa Fe R.R. Co., 153

Wn.2d 780, 787, 108 P.3d 1220 (2005)). But the WAC provisions at issue

governed how employers run their worksites, they did not regulate Kaiser's

actions at issue—namely its failure to provide warnings on a product it

manufactured and sold.

Citing Falk v. Keene Corporation, Kaiser says the provisions are also

relevant to the strict liability claim. 113 Wn.2d 645, 655, 782 P.2d 974 (1989)

("Under the particular facts of a given case, for example, it may be unreasonable

for a consumer to expect product design to depart from legislative or

administrative regulatory standards, even if to do so would result in a safer

product."). But again, the WAC provisions do not govern Kaiser's actions here,

and thus are not relevant to the inquiry of the reasonable expectation of a

consumer.

Even assuming the WAC provisions are relevant, the court did not abuse

its discretion by excluding them based on the unfairness to Budd given the late

disclosure of the provisions as Simmons's reliance material.  See Boeing Co. v. Sierracin Corp., 108 Wn.2d 38, 50–51, 738 P.2d 665 (1987) (upholding trial court's decision to exclude testimony in part because the defendant failed to report the contents of the testimony "until long after discovery cutoff, several weeks into trial and more than a month after Boeing had deposed the engineer"). Kaiser points out that it listed the WAC provisions in its trial exhibit list.  But the list had over 300 proposed exhibits, and Simmons did not suggest that she would testify about the WAC provisions until the evening before her testimony.

Even if the court abused its discretion in excluding the evidence, any error was harmless.  See State v. Gunderson, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014) (The non-constitutional harmless error test asks whether "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" (quoting State v. Gresham, 173 Wn.2d 405, 433, 269 P.3d 207 (2012))).  Throughout the trial, Kaiser was able to, and did, discuss "regulatory standards" in place during Budd's exposure that imposed a threshold limit value of five million particles per cubic foot.

I.  Exposure to a Kaiser Product

Kaiser says that the trial court erred in denying its Posttrial Motion because Budd failed to prove he was exposed to a Kaiser product.  Budd responds that sufficient evidence supports the jury's verdict, particularly given Washington courts' approach to asbestos cases.  We agree with Budd.

We review de novo a trial court's decision to deny a CR 50 motion. Paetsch, 182 Wn.2d at 848.

33

"Generally, under traditional product liability theory, the plaintiff must establish a reasonable connection between the injury, the product causing the injury, and the manufacturer of that product." Lockwood, 109 Wn.2d at 245. "In order to have a cause of action, the plaintiff must identify the particular manufacturer of the product that caused the injury." Id. Liability cannot turn on conjecture. Marshall v. Bally's Pacwest, Inc., 94 Wn. App. 372, 379, 972 P.2d 475 (1999). And courts apply a "more lenient standard[] of proof" to asbestos cases because "the long latency period of asbestosis" means that "the plaintiff's ability to recall specific brands by the time [they bring] an action will be seriously impaired." Montaney v. J-M Mfg. Co., 178 Wn. App. 541, 545, 314 P.3d 1144 (2013) (quoting Lockwood, 109 Wn.2d at 246–47).

At trial, Budd testified, via videotaped deposition, that the manufacturer of the joint compound he worked with was "Kaiser Gypsum." He said that it was the only joint compound product he worked with between 1962 and 1972.[17] Kaiser read into the record Budd's deposition testimony in which he stated that the joint compound he worked with came in white bags with a blue stripe and red lettering that said, "Kaiser." Mary Wright, Kaiser corporate representative, testified at trial about a September 1969 inter-office memorandum, which announced that the joint compound packaging was being changed from its previous design of a white

---

[17] This testimony conflicted with one of his interrogatory responses in which he said he "remembers using joint compound manufactured by Kaiser Gypsum, Georgia Pacific, and U.S. Gypsum." But this shows that Budd has consistently identified Kaiser as a manufacturer of joint compound he used at work. See In re Det. of Stout, 159 Wn.2d 357, 382, 150 P.3d 86 (2007) ("Fact finders are in the best position to resolve issues of credibility and determine how much weight to give evidence because they see and hear the witnesses").

paper bag with black letters and red trim to a kraft bag with black print and red trim. But she acknowledged that the memorandum did not specify how long before September 1969 that had been the design of the packaging. She also testified about a 1953 inter-office memorandum about planned applications for trademarking product packaging designs, which involved dots in specific designs. She acknowledged that she had never seen a photo of Kaiser joint compound packaging from the pertinent time. She said that, during the pertinent time, Kaiser supplied joint compound in Moses Lake, which is where Budd worked.

The evidence sufficed to sustain the jury's verdict. Budd testified that Kaiser manufactured the joint compound he used. Many years have passed, but he claimed to have worked with the product for about 10 years. His description of the packaging differs from the 1969 inter-office memorandum description. But the jury reasonably rejected that as a basis for questioning Budd's credibility. The memorandum does not say how long Kaiser used the prior version of the packaging. And as for the 1953 trademark memorandum, it does not specify how prominent the dot designs were or that the design remained in use during the time of Budd's exposure. And Budd's description of the packaging does not necessarily conflict with or exclude the possibility of a dot design on the packaging. And Kaiser confirmed that its joint compound was sold where Budd worked during the pertinent time. Budd clearly and consistently identified the product he used as Kaiser's. Viewing the evidence in the light most favorable to Budd and considering the lenient standard in asbestos cases, which reflect

35

mesothelioma's long latency period, we conclude the evidence sufficed to sustain the jury's verdict.

We affirm.

_____Chun, J._____

WE CONCUR:

_____Smith, J._____          _____Dwyer, J._____